**UNITED STATES of America, Plaintiff,**

v.

**Frank R. WEST and American Beef Packers, Inc., Defendants.**

Crim. No. 75–0–87.

United States District Court,
D. Nebraska.

Jan. 21, 1976.

Daniel E. Wherry, U. S. Atty., District of Neb., Michael L. Schleich, Asst. U. S. Atty., District of Neb., for plaintiff.

Arthur D. O'Leary, Omaha, Neb., for defendant, Frank R. West.

Lyle E. Strom, Omaha, Neb., for defendant, American Beef Packers.

## MEMORANDUM

DENNEY, District Judge.

This matter comes before the Court for decision subsequent to trial and the submission by the parties of final argument in written form.

American Beef Packers was once the second largest packinghouse and the 218th largest corporation in America. In the fiscal year ending July, 1974, it had sales of $896,904,000, net earnings of $4,861,000 ($2.50/share), over 3000 employees, and slaughtered 1,483,100 cattle and 564,000 hogs. Six months later, it filed for Chapter XI bankruptcy.

On August 8, 1975, American Beef Packers, Inc., Frank R. West, Robert E. Lee, and Beefland International, Inc. were named in a 105 count indictment alleging violations of 18 U.S.C. §§ 1341, 1343, 2314, 371 and 2. The gist of the indictment is that the defendants devised and executed a scheme or artifice to defraud cattle feeders and creditors of money or property valued in excess of 20 million dollars. At the close of the plaintiff's case, the Court granted the motion of Robert E. Lee to dismiss on the grounds of insufficient evidence. Beefland International was dismissed as a defendant at the close of all the evidence, on the grounds that it was a wholly owned subsidiary of American Beef Packers and that, as such, its inclu-

sion was duplicitous. As against Frank R. West, the Court dismissed all counts except those [Counts 75 through 82, inclusive; 84 through 97, inclusive; and 99 through 101, inclusive] relating to the diversion of funds from the General Electric Credit Corporation [hereinafter GECC]; likewise, as against American Beef Packers [hereinafter ABP], the Court dismissed all counts except Counts 41 through 47, inclusive; 71 through 82, inclusive; 84 through 97, inclusive; and 99 through 101, inclusive, relating to the diversion of funds from GECC and the purchase of cattle from Chapman Cattle Company. Although not required to do so, the Court will discuss the facts and circumstances underlying all of the counts as charged in the indictment.

In accordance with F.R.Cr.P. 23(c), the Court makes the following findings of fact and conclusions of law.

ABP began in 1963, when the defendant, Frank R. West, and others, purchased Western Iowa Pork. Prior to that time, Mr. West had been engaged exclusively in the order buying business. Western Iowa Pork, a hog packinghouse located in Harlan, Iowa, was not initially successful and Mr. West loaned the company money and took over its day to day operations until it became a going concern. American Beef Packers then opened a plant in Oakland, Iowa, in late 1966, and again Mr. West took over the day to day operations. A plant was opened in Omaha, Nebraska, in 1968, and, in 1972, Beefland International [hereinafter BI] was acquired.

GECC had been financing BI while James Talcott had been providing credit to ABP. However, when BI was acquired, ABP switched to GECC as its prime source of credit, and thereafter both BI and ABP credit lines were identical, consisting of an accounts receivable financing arrangement. This type of financing was necessary, due to the high sales volume and the fact that the practice in the industry was that cattle feeders were paid by check immediately upon delivery of the cattle, while purchasers of slaughtered carcasses typically did not pay the packinghouse until two weeks after delivery. Thus, almost three weeks would elapse from when ABP purchased a head of cattle until that head was paid for by the customer (e. g., a supermarket or wholesaler).

These credit agreements, signed on June 28, 1972 [Exhibits 203A and 204A], extended a 41 million dollar revolving line of credit secured by the accounts receivable of ABP and BI, and a 13 million dollar long term loan. The actual amount of the revolving loan varied, but was not to exceed an amount equal to 90% of "eligible receivables" plus 60% of inventory.

Eligible receivables were computed daily by taking receivables less than 30 days old, and making various adjustments based on the amounts received at various lockboxes that day, and the sales for that day. In the event that the updated figures indicated an increase in collateral, then GECC declared the amount by which 90% of eligible receivables plus 60% of inventory exceeded the loan balance, as "available." ABP could receive money under their loan, on a daily basis, only to the extent such moneys were "available."

To insure collection, the loan agreements provided for "lockboxes", which were post office boxes in various cities. A bank in each city was authorized by ABP to pick up customer checks coming into the lockboxes and to deposit the checks in a GECC account in the bank.

When a customer's check was received at a lockbox, it was credited as a payment on ABP's loan, and simultaneously a like amount was taken off the receivables, thus reducing the collateral. Each morning, an employee of ABP (usually Lowell Smith) would call an employee of GECC (usually Louis Kovanda). These men would exchange figures on the sales of the preceding day and the lockbox receipts. In addition, Lowell Smith would compute the amounts needed at ABP's bank to cover checks written by ABP on those banks. ABP and GECC usually agreed on the amount that ABP was entitled to under the loan agree-

ment, and by 3:00 P.M. Omaha time GECC would have wire transferred the funds to ABP's bank.

In the fall of 1974, ABP established checking accounts at banks distant from the livestock feeding areas of the midwest. This was done to take full advantage of mail delays that would postpone presentment of ABP checks, thereby giving ABP a few days before it was necessary to borrow money from GECC to cover the checks. The operation of these checking accounts is more fully explained subsequently in this Memorandum.

On several occasions, from December, 1973, through June, 1974, ABP diverted incoming checks that would normally have been deposited in lockbox accounts. This was accomplished by Mr. Lowell Smith or Herbert Schrader of ABP, who would call various customers of ABP and request that they send their checks to ABP offices instead of to the lockboxes. There were also a few customers who sent their checks to ABP out of habit or inadvertence. For these few customers, GECC and ABP established a lockbox account in the Omaha National Bank. Under the terms of the loan agreement and the common understanding of the parties and their practices, *all* receivables were to be deposited into a lockbox account. [See ¶ 8, Exhibit B, as amended, of Exhibit 203A]. Thus, a diversion was accomplished by taking checks coming into ABP and depositing them into the Northwestern National Bank—using the money for 7 to 10 days and then wire transferring the money into the ONB lockbox account. In early 1974, the amount of the diversion would approach 3 million dollars but before June, 1974, ABP would always pay back the diversion (by wire transfer to the ONB lockbox account) before the end of the month.

Prior to June, 1974, Mr. Taphorn, then the financial vice-president of ABP, *discussed this practice with Frank West on numerous occasions.* Mr. Taphorn proposed various methods of increasing their operating cash by selling liquid assets (e. g. cattle on feed) and usually Mr. West would agree, and the diversion would be cleaned up temporarily.

Mr. Taphorn left ABP in June, 1974, because the company was in need of ever increasing amounts of cash, and he felt that as he was unable to raise the necessary funds, he should step aside. Tom Clark, formerly employed as a CPA by Arthur Anderson, Inc., was hired to replace Mr. Taphorn. Mr. Clark was no more successful than Mr. Taphorn in raising funds. ABP was in the process of constructing a large plant in Dumas, Texas. When construction began in the fall of 1973 on the Dumas plant, its estimated cost was 11 million dollars and ABP planned to finance it with 8.5 million dollars in long term money from GECC and the Economic Development Association, while the remainder was to be paid out of working capital. Dumas, however, began to cost more than anticipated. In June, 1974, expenditures on Dumas had escalated to 15 million dollars, of which 7 million dollars then had to be financed out of working capital. The costs continued to rise to a figure approaching 20 million dollars, yet the plant was still not completed by January, 1975.

Exhibit 411, a summary prepared by Eugene Peuterbaugh of the Packers and Stockyards Administration, demonstrates the extent of the diversion. In June, 1974, nine checks totalling $2,142,227 were diverted and used for an average of 34 days. July saw eleven checks totalling $1,316,388 being diverted for an average of 22 days. In August, 1974, twelve checks totalling $5,022,361 were diverted and used for an average of 20 days. As accounts more than 30 days old were dropped from the list of eligible receivables, there was no advantage to ABP in retaining a diverted check past the time the account was 30 days old. This fact is reflected in the figures for the subsequent months, showing an increased sophistication in the diversion. September saw eleven checks totalling $3,838,614 being diverted for an average of nine days. In October, 1974, the size

and frequency of the diversion increased to such an extent that oftentimes groups of checks were deposited in the Northwest National Bank at the same time. Bookkeeping became a nightmare. Gail Keenan, an ABP employee, testified that she would prepare [Exhibit 402] deposit slips in duplicate and would make a copy of all diverted checks. These internal documents were necessary to keep track of the diversion and to eventually update the accounts receivable when the money was transferred back out of the Northwestern National Bank and into the lockbox account at the Omaha National Bank. Essentially, the normal business procedure of matching customer checks with invoices, then marking the invoices paid and removing them from the accounts receivable, was not performed when ABP received the checks—instead, copies of the checks were retained and the matching was done when the diverted funds were returned to the ONB. Mrs. Keenan was instructed by Lowell Smith not to show these documents to GECC auditors. She followed these orders and the GECC auditors, who performed monthly audits, as a result, never discovered the diversion.

Even with these documents, a thorough accounting of each customer check is very difficult as the totals the Court must work with typically represent a multitude of checks, thereby obfuscating the history of individual checks. As best the Court can determine, October, 1974, saw 16 separate checks totalling $2,583,-871 diverted for an average of 10 days, as well as other deposits totalling $4,081,414, which were diverted for approximately 15 days. In November, 1974, five separate checks totalling $147,-717, as well as other deposits totalling $2,527,536, were diverted. Some of this money was still in the Northwest National Bank when the diversion was discovered on December 16, 1974. December saw 127 separate checks totalling $5,109,141 diverted for an average of 12 days, and 74 of these were outstanding when the diversion was discovered. All of these December checks were diverted in the first half of December, as the diversion ceased operating on such a grand scale when GECC auditors descended on ABP shortly after December 16. At that time, the amount of the diversion stood at $3,513,508.00.

Of this multitude of checks spanning a period of 7 months, the defendants stand charged with 24 counts of mail and wire fraud relating to 24 specific checks, the evidence bearing on which the Court will discuss later in this Memorandum.

In October, 1974, Louis E. Kovanda of GECC met with Tom Clark at GECC offices, for the purpose of discussing a proposal made by GECC in June, 1974 [Exhibit 223A] that would increase ABP's line of credit from 54 million dollars to 93 million dollars (80 million of which would be available for a revolving loan) and would provide for "co-lending" banks. This expanded line of credit was contemplated by the parties as a method of financing the additional accounts receivable that would be generated when the Dumas plant became operational. Tom Clark was unsuccessful in attempting to obtain additional long term financing.

The prior agreement was not financed totally by GECC; rather, there were "participating" banks which provided capital but could withdraw it on 60 days notice. GECC, due to its cost of administrating the loan, charged interest equivalent to the prime rate plus 3%, while the participating banks received a somewhat lower figure. GECC was not totally pleased with the "participating bank" system of financing, as GECC was concerned that the participating banks might withdraw their capital on short notice, thereby increasing GECC's risk of loss. The new agreement was to provide for "co-lending", whereby a bank supplying capital could not precipitously withdraw its capital.

At the October, 1974, meeting, Tom Clark was in general agreement with the GECC proposal, except for one provision that allowed GECC to have a man officed at ABP premises at all times. A

compromise was reached where a GECC man would merely have unrestricted access to the ABP offices, but he would not be officed there.

A meeting was set for December 10, 1974, to further discuss the proposal with various banks which were interested in becoming co-lenders.

On October 24, 1974, Mr. Lowell Smith, of ABP, authorized the Wachovia Bank and Trust, in Winston-Salem, North Carolina, to set up 6 disbursement accounts and a funding account [Exhibit 244c]. The accounts were numerous because ABP wanted to keep separate accounts for each of its plants. When checks were written on one of the disbursement accounts, they would take some time (called a disbursement float) to reach Wachovia. When the day's checks were received, Mr. Christie of Wachovia would call Mr. Smith and tell Smith the amount needed in the funding account for that day. Mr. Smith would have GECC or ABP wire transfer into the funding account, after which Wachovia would make an internal transfer— leaving the accounts at zero balance— except for a compensating balance (approximately $50,000) that was always on deposit to compensate Wachovia for its services. These accounts began operation on November 19, 1974, with an ABP deposit of $50,000, and the first checks were written on November 21, 1974, and continued in operation thereafter. On approximately the same date, similar accounts were established at the Seattle First National Bank in Seattle, Washington. Because of the time difference between Seattle and Omaha, and the fact that the Federal Reserve System providing for wire transfers ceases operation at 2:00 P.M. Eastern Time, the Seattle accounts could not be paid by wire transfer. Instead, the Seattle accounts operated on a system of "cash letters." ABP was required to keep $2,000,000 on deposit in the Seattle bank to "cover" the bank for the two-day time lag in collecting from the Northwestern National Bank in Omaha. When checks drawn by ABP on the Seattle bank were

received at the Seattle bank, the bank would issue a "cash letter" through the Federal Reserve System requesting cash from the Northwestern National Bank. When, on three occasions, the cash letters were received in Omaha, the Northwestern National Bank refused payment because of insufficient funds.

Since the Federal Reserve had credited the Seattle bank and debited the Northwestern National Bank before the refusal, "Debit Letters" were issued by the Northwestern National Bank to the Seattle bank, thereby causing the Federal Reserve accounts for these banks to correctly reflect that the Northwestern National Bank had refused payment.

This cash letter/refusal/debit letter process occurred three times, between December 29, 1974, and January 7, 1975, constituting Counts 7–12.

At the Regency Hyatt House in Rosemont, Illinois, on December 10, 1974, at 10:00 A.M., Mr. Kovanda and Mr. Diederich, for GECC, and Mr. Clark and legal counsel David Pavel, for ABP, met with representatives of eleven banks, including Ed Kohout and Frank Seibert representing the Northwestern National Bank of Omaha. A rough draft of the new credit agreement was passed around and met with general agreement. At the close of the meeting, it was decided that Mr. Diederich, of GECC, would iron out some legal technicalities, and that the parties would meet again on December 19, 1974.

The diversion was discovered on Friday, December 13, when Ed Kohout of the Northwestern National Bank in Omaha observed an employee of ABP (probably Gail Keenan) deposit checks, which appeared to be receivables, into the ABP corporate account. From his knowledge of the credit agreement, which he had obtained at the meeting three days earlier, he knew that customer checks were to go solely to lockbox accounts. He then called Mr. Kovanda at GECC's Chicago office and informed him of what he had seen. Mr. Kovanda informed Mr. Diederich of the substance of the call, and Mr. Diederich then called

Lowell Smith at ABP, seeking an explanation. Smith wasn't willing to give a full explanation and merely told Mr. Diederich that there must have been some mixup. He then promised to look into the matter and call Mr. Diederich back, but never did. That afternoon, Mr. Diederich called again and was given the same explanation—that it was a clerical mixup.

On December 16, 1974 (Monday), Mr. Diederich came to Omaha to meet with legal counsel concerning the new loan agreement. He also set up a meeting at 4:30 P.M., in ABP's offices. Present were Tom Clark and Bill Edwards, of ABP, and Mr. Diederich. At the meeting, Mr. Clark stated that the practice of depositing receivables in the Northwestern National Bank had been going on for some time, possibly more than two years. Mr. Clark stated he knew about it as of September, 1974, while Mr. Edwards stated he knew of it in May, 1974. In addition, Mr. Clark states that he had told Frank West of the practice that afternoon and that Mr. West directed Mr. Clark to inform GECC immediately. Mr. Diederich asked how much was involved (diverted) and Mr. Clark responded 3.5 to 4 million dollars.

Mr. Clark explained that when receivables were deposited in the Northwestern National Bank ABP would debit its cash account and make an offsetting entry in their miscellaneous receivables account # 23. After 7–10 days, the funds would be wire transferred to the lockbox account in the ONB, whereupon ABP would debit the # 23 account and credit the cash account, while crediting the trade receivables account # 20 and debiting the GECC loan account (TR. 471). Mr. Diederich then called Mr. Schwartz at GECC's Chicago office and explained the details of the diversion. The meeting adjourned at 7:15 P.M. and Mr. Diederich flew back to Chicago that night.

That evening, Mr. Schwartz called Mr. Kovanda in Puerto Rico and informed him of the general problem. Mr. Schwartz was directed to go to Omaha

and be physically present at ABP. Mr. Kovanda then called Mr. Clark at his home at approximately 10:00 P.M. (Puerto Rico time). Mr. Clark stated again that the diversion was about 3.5 million dollars; that Mr. West had no prior knowledge; and that he (Clark) didn't know about it before June, 1974.

At the Regency Hyatt House in Rosemont, Illinois, Wednesday, December 18, 1974, Mr. Kovanda, Mr. Schwartz, Mr. French, Mr. Diederich and Mr. Long, of GECC, met for dinner with Mr. West, Mr. Dick Robinson, Mr. Clark and Mr. Bill Edwards, of ABP. After dinner, the parameters of the diversion were discussed and Mr. Edwards stated that the diversion had got as high as 5.5 to 6 million dollars. Mr. Clark proposed a 120 day schedule [Exhibit 244A] for paying back the diversion by reducing inventory, selling a plant in Nebraska City, and by a sale and lease back of a plant in Fort Morgan, Colorado.

At the Regency Hyatt House at 10:00 A.M., the next day, December 19, Mr. French, Mr. Diederich, and Mr. Kovanda, of GECC, met with representatives of the eight participating banks. Mr. Kovanda explained the situation regarding the diversion, after which Mr. West, Mr. Robinson, Mr. Clark and Mr. Edwards, of ABP, joined the meeting. Mr. Clark explained his proposal [Exhibit 244A] for replenishing the funds and asked that ABP be given 120 days to do so. The meeting adjourned in the afternoon, with ABP to make a formal request for a 120 day forebearance, and with the representatives of the banks to consult with their home offices.

On Monday, December 30, Lowell Smith conferred with Ed Kohout of the Northwestern National Bank at 2:00 P.M. Mr. Smith indicated that ABP was entitled to $1,200,000 as advances on cattle feeding loans (equal to 80% of inventory as determined at the end of each month). The next morning, Mr. Kohout called Mr. Smith and said that only $620,000 would be advanced.

First, briefly at the Granada Inn in Omaha, and then at Mr. West's office at

ABP, late in the evening of December 30, Mr. Long, Mr. French, Mr. Kovanda, Mr. Diederich, of GECC, and Mr. Albino, GECC's house counsel, and Mr. Ruff, GECC's outside counsel, met with Mr. West, Mr. Robinson, Mr. Clark, Mr. Lee, and Mr. Pavel. Mr. Ruff stated that, due to the reluctance of the participating banks and GECC's own intentions, ABP would only be granted a 30 day forebearance of the diversion. The meeting concluded with Mr. Pavel, Mr. Ruff and Mr. Albino to draft the necessary documents, and the meeting to reconvene the next morning.

The next day, December 31, at 9:30 A.M., in Mr. West's office, Mr. Long, Mr. French, Mr. Kovanda, Mr. Albino and Mr. Ruff, of GECC, met with Mr. West, Mr. Robinson, Mr. Clark and Mr. Lee, of ABP. At this meeting, a 30 day forebearance agreement [Exhibit 213A] was signed.

Meanwhile, Lowell Smith and Mr. Diederich attempted to compute that day's "availability" figures. The testimony and documentary evidence is very confusing on this point, but apparently Mr. Smith needed $5,100,000 to cover checks that came in that day, and he asked for that figure, even though he didn't expect to get it, as only $2,700,000 was "available." A $2,240,000 depository transfer check from the Seattle bank had been received at the Northwestern National Bank and was included in the $5,100,000 needed that day by ABP. Mr. Smith then asked for $4,600,000 which Mr. Diederich tentatively agreed to advance, but which was subsequently reduced by $1,400,000 after Mr. Diederich conferred with his superiors, Mr. Long and Mr. Kovanda. Thus, ABP received only $3,200,000.00. It should be noted, however, that the $3,200,000 further increased ABP's over advanced position by $500,000 over the amount of the diversion.

ABP employees insisted during the trial that they had been "shorted" $1,400,000.00. The Court has carefully reviewed the conflicting testimony of Mr. Smith, Mr. Kovanda and Mr. Diederich, as well as the adding machine tapes for December 31 (called "availability tapes") and can find no support for the position that they had been shorted. The probable source of the dispute over the availability on the 31st occurred the previous week when ABP did not kill on December 24 and 25. As a result, there were no new receivables generated on those days and the parties had a working arrangement to smooth out fluctuations in the loan that arose from holidays and other days on which no cattle were killed. Again, a holiday would produce no new receivables, even though checks for cattle purchased before the holiday would be received at the banks. About three days after the holiday, there would be a sudden drop in the amount of checks received at the banks, reflecting the fact that no cattle were purchased on the holiday. Thus, GECC would advance extra money on a holiday (or the day after, should the banks be closed that day) beyond the amount available. Three days later, GECC would recoup the overadvance. On December 26, only $3,650,000 was available, but GECC advanced $5,100,000 to cover the holiday fluctuation. On December 31, they recouped the extra $1,450,000—therein lie the "shorted" funds.

On the afternoon of the 31st, the ABP Board of Directors met and discussed both short and long term financing. In addition, the Board was advised of the signing of the forebearance agreement with GECC.

At the close of the meeting, bankruptcy was discussed as a possible last resort, should ABP be unable to secure the necessary financing.

The next business day, Thursday, January 2, 1975, availability and the amount of GECC's advance were computed without dispute, although Mr. Smith unsuccessfully attempted to gain back the $1,400,000 he thought was shorted on the 31st. Apparently, ABP had sufficient cash to continue as $1,400,000 was wire transferred to the Seattle bank as promised. In the afternoon, a wire transfer from GECC to the Omaha National Bank

was late in arriving. At 3:00 P.M., the bank began its procedure for returning the checks for insufficient funds, but at 3:20 P.M., the wire transfer was received and the checks were resubmitted.

Friday, January 3, saw ABP's financial plight worsen significantly. Mr. William Edwards, Treasurer for ABP, met in Frank West's office at 9:30 A.M. together with Tom Clark, Harvey Roffman and Richard Robinson. Mr. Edwards also conferred, by phone, with Mr. Pavel, an attorney for ABP, who indicated that ABP could pay certain creditors of ABP with certified checks. Mr. Pavel told Mr. Edwards that whether the checks would be preferences would be an issue for the Bankruptcy Court to decide. There is no doubt that the creditors paid by certified check were bona fide creditors. Around 11:00 A.M., Mr. Edwards went to Washington, D. C. with Mr. Roffman to attempt to secure financing (80 million dollars) from Arab interests. Mr. Edwards returned on the afternoon of January 4.

GECC advanced $3,575,000.00. Of this amount, $600,000 was earmarked for the Michigan National Bank; $250,000 for the Union Commerce Bank; and $2,725,000 was to go to the Northwestern National Bank for eventual wire transfer to the Seattle bank. Due to the problems experienced on December 31, the Seattle bank was unwilling to continue its practice of issuing depository transfer checks and instead wanted wire transfers to cover the previous day's checks. The money earmarked for the Seattle Bank ($2,725,000) was insufficient, by several hundred thousand dollars, to cover the previous day's checks. In Frank West's office at ABP, Lowell Smith, Tom Clark, Robert Lee, William Edwards and Richard Robinson discussed the cash shortage at the Seattle bank. A decision had to be made by 2:00 P.M., Omaha time (12:00 Noon Seattle time) because by rule of the Federal Reserve the checks had to be either returned or paid by noon Seattle time. Although denied by Mr. West, the Court finds that he was present at this meeting and that he made the ultimate decision to have the checks returned. This decision was made at 2:20 P.M. Omaha time. However, by then the Seattle bank was already in the process of returning the checks. Subsequently, Lowell Smith wired $2,725,000 to Seattle.

He then called the Seattle Bank and requested that a total of $717,894 be wire transferred back to the accounts of Best Transportation, Superior Insurance, Nebraska Hog Buyers, Mike Amoura, Superior National Installations, and to other accounts of unknown ownership. Mr. Pixley of the Seattle bank refused to return the money, as his bank's policy was to freeze an account once any checks drawn on that account were returned. Eventually, the ABP money in the Seattle bank was disbursed, $1,500,000 to pay depository transfer checks, $1,000,000 was returned to ABP on January 7, and $1,560,000 was returned to ABP on January 9.

At approximately 2:00 P.M., Lowell Smith called the Wachovia Bank and informed Mr. Christie that ABP could not wire the funds that day. Mr. Christie instigated bank procedure to return the checks and requested Mr. Smith to confirm in writing the unavailability of funds. Mr. Christie took the compensating balance and paid it out, starting with the smallest checks received that day.

At various times during the 3rd, the following checks drawn by ABP on ONB were written and certified:

| | | | |
|---|---|---|---|
| a. | $12,763.52 | payable to | Midwest Order Buyers, Inc. |
| b. | $63,816.96 | payable to | Northwestern Order Buyers |
| c. | $62,098.35 | payable to | Ron Bruck |
| d. | $281,815.94 | payable to | Omaha Hog Buyers |
| e. | $61,781.90 | payable to | Floyd Kraukau |
| f. | $4,256.38 | payable to | Best Refrigerated Express |
| g. | $66,056.13 | payable to | "       "       " |
| h. | $126,614.72 | payable to | Farmland Order Buyers |

While the circumstances surrounding the issuance of these checks are unusual and somewhat suspicious, all were in payment of valid bills or debts owed by ABP. In each instance, the recipient of the checks was a former business associate of Mr. West—some of whom owed money to Mr. West. These checks were, however, written on the advice of counsel, who was of the opinion that payment was legal, although, should ABP file for bankruptcy, the money might have to be returned in the event the Bankruptcy Court found the checks to be a preference, and, in fact, some of the money was ordered to be returned.

Mr. Grover, Operations Controller for ABP, was told by Tom Clark to have the seven plant controllers hold invoices until further notice. Mr. Grover did so. Also, on this date, Tom Clark instructed Mr. Grover to have the plant controllers delay the issuance of checks for one day. Delaying checks for a day had been done before, but was not a common occurrence.

Throughout January 3, ABP livestock buyers in the field purchased cattle in accordance with the instructions they received early in the morning from the ABP "buying office." Each of the buyers was equipped with a two-way radio, enabling them to communicate with the buying office while they were out in the field, and many of the counts · relate to the failure of ABP to communicate with their buyers and tell them not to buy. As a practical matter, however, the volume of cattle purchased on the 3rd was below normal, and most had been purchased before ABP's cash problem with the Seattle bank had reached its full dimension.

ABP cattle buyers, as is typical in the business, would transact their purchases with a mimimum of paperwork. The buyer attempted to keep track of the quality and maturity of the cattle owned by the various feeders in his area. When he felt the cattle were ready for slaughtering, he would visit with the feeders and the two would agree to a price and shipping arrangements. Typi-

cally, delivery to the packinghouse was scheduled for three to seven days after the initial purchase and oftentimes the feeder would accompany his cattle to the packinghouse where he would receive a check after the cattle were weighed. Other pricing techniques ("Hot weight basis" and "Grade and yield basis") required that the cattle be slaughtered before the total price could be determined. In those cases, a check was mailed to the feeder.

On Saturday, January 4, 1975, Mr. West called Mr. Kovanda and requested that Mr. Kovanda set up a meeting in Stamford, Connecticut (GECC's home offices) with Mr. Long. Mr. West stated that the purpose of the meeting was to permit Mr. Leonard, an attorney for ABP, to make a proposal to solve the problems of ABP. Mr. Kovanda, in a series of phone calls, set up a meeting for the date requested by Mr. West—January 6, 1975.

ABP cattle buyers purchased cattle from several feeders for delivery Sunday evening or early Monday morning. Most of the cattle buying was done in the morning, and the volume purchased was less than usual for a Saturday.

Throughout Saturday, Mr. Clark and Mr. West sought sources of long term financing, including the Monsanto and Teamsters Pension Funds. That afternoon, attorneys for ABP started drafting a Chapter 11 Bankruptcy petition that was to be used in the event ABP was unsuccessful in obtaining additional financing from GECC.

The cattle purchased on the 3rd and 4th of January were delivered for slaughtering on Monday, January 6, and were slaughtered beginning early in the morning and ending around 3:00 P.M. As previously stated, the number of cattle slaughtered on the 6th was below normal.

At 2:30 P.M., Monday, at GECC's headquarters in Stamford, Connecticut, Mr. Don Leonard, Mr. Charles Sikes and Mr. Clark, of ABP, met with Mr. Long, Mr. French, Mr. Albino and Mr. Kovanda, of GECC. Mr. Clark explained that

ABP needed $5,000,000 immediately, and asked that GECC loan the money and guarantee all drafts in transit, amounting to 13 million dollars. The representatives for ABP stated that if GECC turned them down ABP would be forced into bankruptcy. Mr. Long refused the request and stated that he was caught by surprise at the size and timing of the request. Mr. Long requested that any filing of bankruptcy be delayed until he could discuss the matter with Mr. West. Mr. Long called Mr. West. Mr. Leonard also talked to Mr. West and, in heated words, Mr. Leonard asked Mr. West not to file bankruptcy.

The meeting adjourned with Mr. Kovanda flying back to Chicago with Mr. Clark, Mr. Sikes and Mr. Leonard, while Mr. French, Mr. Long and Mr. Albino made reservations to fly to Omaha on the 7th.

On January 7, 1975 (Tuesday), ABP and BI filed bankruptcy under Chapter 11 early in the morning. Mr. Kovanda flew from Chicago to Omaha and met with other GECC representatives, Mr. Ruff, Mr. Albino, Mr. Long and Mr. French at the Hilton Hotel.

Richard F. Grover, Operations Controller for ABP, received instructions from Tom Clark in the morning of January 7 to have the seven plant controllers (in Oakland, Harlan, Beefland, Nebraska City, Omaha, Fort Morgan and Dumas) stop writing checks in payment for livestock.

Turning now to the facts surrounding ABP's transactions with the Chapman Cattle Company, the Court makes the following specific findings of fact pursuant to F.R.Cr.P. 23(c).

William Chapman, President of Chapman Cattle Company, testified that he sold 150 head of cattle at 5:00 or 5:30 P.M. on Friday, January 3, 1975, to ABP. [TR. 1149]. He became concerned that something wasn't right when ABP truckers picked up the cattle for slaughter early Monday morning, January 6, 1975, because cattle that he had sold in the past had not been picked up by ABP for 5–10 days. ABP employees began loading cattle at the Dinklage Feed Lot,

where the Chapman cattle were located, at about 7:00 A.M., Mountain Time, on January 6, 1975. This feed lot is located in Sidney, Nebraska, approximately 75 miles from ABP's Ft. Morgan plant, so the cattle were not delivered to the plant until approximately 9:30 A.M., Mountain Time (10:30 A.M., Omaha time). The transportation of these cattle is charged in Count 41.

Duane Von Seggern, the feed lot manager at Sidney, was also concerned that something was not right at ABP because they had cancelled some orders for delivery on January 7, 1975. At 10:33 A.M., Mountain Time, on January 6, 1975, Mr. Von Seggern called the ABP buyer, Dave Gertge, at the Ft. Morgan plant to find out why they had cancelled other sales. He was told that they were not going to kill on January 7, 1975. This telephone call is charged in Count 42.

The order not to kill on the 7th was received in a telephone conversation that Brent DaBell, the ABP plant manager, testified that he had with Virgil Eades. DaBell was not sure of the time, but he testified that Eades instructed him to "kill all the cattle we had on hand and not plan any kill for the following day." [TR. 1449]. Since Mr. Von Seggern called Mr. Gertge because sales of cattle had been cancelled, the call between Mr. DaBell and Mr. Eades had to be prior to 10:30 A.M., on January 6, 1975. This timing is important, because it could not have been too much before 10:30 A.M. that the 150 head of Chapman cattle arrived at the ABP plant.

Having determined that ABP was not going to kill on the 7th, a weekday and a very unusual occurrence, Mr. Chapman and Mr. Von Seggern became suspicious and began efforts to secure the return of Mr. Chapman's cattle. At approximately 2:00 P.M. on the 6th, Chapman called Mr. Von Seggern and told him to go to ABP's Ft. Morgan plant and pick up the check for the cattle. Von Seggern called the ABP plant and was told that the Ft. Morgan plant was not in any trouble and that the check would be mailed [Charged in Count 43]. Von Seggern wanted the check, however, and did in fact drive to Ft. Morgan and pick up the check in the

amount of $69,417.64. This check was drawn on the Michigan National Bank in Detroit and has been introduced in evidence as Exhibit 41G.

Mr. Chapman then had a private pilot fly to Sidney that evening and pick up the check, so that he could present it for payment Tuesday morning. He then had his secretary flown to Detroit where she made an attempt to cash the check the following morning, but payment was refused by the Michigan National Bank. This development prompted Mr. Chapman's secretary, Roselle Calmes, to make two telephone calls from Detroit to Mr. Chapman in Omaha, as charged in Count 44.

Once Chapman determined that he was not going to be paid for his cattle, he started making efforts to attach the carcasses in some way. He called the Ft. Morgan plant four times [charged in Count 45] on January 7, 1975. He talked the first time to Mr. DaBell, the plant manager, to try to find out if the carcasses were still in the cooler. Mr. DaBell promised to check to find out this information and call Chapman back. The manager failed to return the call, so Mr. Chapman called again. Mr. DaBell told him the carcasses were still there and Mr. Chapman requested that he identify the carcasses in some way. Mr. DaBell informed him he had to check Omaha to determine what action to take. Mr. DaBell again failed to return the call, so Chapman called again. This time, DaBell informed Chapman that he had checked with Omaha and was instructed to take none of the action Chapman had requested. Chapman again requested that the carcasses be identified and DaBell said he would if he could. About one hour later, Chapman called again and was told that all the meat had been shipped out and, in the words of the manager, it was "c'est le vie." [TR. 1143].

On January 7, 1975, Mr. Von Seggern was also attempting to obtain the Chapman beef. He called the ABP plant at 9:46 A.M. [Charged in Count 46], almost three hours before the Chapman calls were made. He was told at that time that the beef had all been shipped out and the plant was locked up.

The next day, January 8, Mr. Von Seggern made one additional call to the Ft. Morgan plant, but had no success in obtaining either the carcasses or payment. This call is charged in Count 47.

With the foregoing background of facts, the Court must now turn to the specific charges made in the indictment. Although not required to do so under F.R.Cr.P. 23 or 29, the Court will review the factors it considered in dismissing many of the counts against the remaining defendants, ABP and Frank West. The dismissals of Robert Lee and Beefland International have been already explained by the Court on previous occasions.

The evidence presented in this case clearly shows that, from June, 1974, through the filing of bankruptcy on January 7, 1975, ABP was in desperate need of cash on a day to day basis. The efforts of Tom Clark and Frank West to secure long term financing were unavailing, and construction of the Dumas plant was draining working capital at an alarming rate. Obviously, ABP had expanded too fast without adequate financing. ABP's solution to this problem was to intentionally divert monies from their major creditor. What began as a system for handling customers who made inadvertent mailings to ABP's headquarters, or who were credit risks, gradually escalated into a scheme to defraud. At some time prior to the summer of 1974, the shortage of cash prompted intentional diversions of checks from some of ABP's largest customers. These customers were not credit problems, nor were the mailings to ABP's headquarters inadvertent. James Taphorn testified [TR. 783–785] that he discussed the diversion with Frank West on six to twelve occasions. Taphorn would indicate how much had been diverted and would request that Mr. West order the conversion of liquid assets (e.g., cattle on feed) into cash by the end of the particular month. During Mr. Taphorn's tenure as financial vice-president, the diversion was reduced to zero at the end of each month, so as to

present a "clean" financial statement. Shortly after Mr. Taphorn left ABP, in June of 1974, the scheme became more sophisticated. Instead of "cleaning up" the diversion at the end of each month, an artificial accounting practice was initiated that permitted the diversion to continue unabated and undetected through the month end financial statement. To summarize the Court's earlier findings, the money collected was shifted from the main receivables account into a miscellaneous receivables account, without any indication that the money had not only been received but also spent. In *United States v. Simon*, 425 F.2d 796 (2 Cir. 1969); *cert. den.* 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420, the Second Circuit painstakingly reviewed the possible criminal liability incurred through improper accounting of receivables. The test is whether the financial statements as a whole fairly present the financial position of the company. If they do not, the basic issue becomes whether the defendants acted in good faith. Proof of "good accounting practices," while it may be highly persuasive, is not conclusive in resolving questions of good faith.

There can be no dispute that ABP's accounting system misrepresented its financial position. One only has to look to the testimony of Gail Keenan [TR. 714, et seq.] to see patent lack of good faith. She related how what was essentially a secret set of books was maintained and hidden from GECC auditors.

█ The defendants contend, however, that the diversion was lawful and in accord with certain language in the contract. After careful study of the contract language, the Court cannot agree with the defendants' position that ABP was entitled to retain receivables for 10 days before turning them over to GECC. The pertinent contractual language is as follows:

8. GECC hereby grants permission to Assignor on the conditions herein specified, to collect Assigned Accounts, at no cost or expense to GECC, but such privilege may be terminated at any time by GECC. xxx   .   .   . xxx GECC shall have the right to send notification of Assignment to any or all Account debtors, and GECC shall thereafter have the sole right to collect the same. Assignor, while collecting any Assigned Accounts, shall receive any and all collections thereon, in cash or otherwise, solely on behalf of and in trust for GECC; and Assignor expressly agrees, immediately upon receipt thereof, to transmit and deliver all such collections to GECC in kind, in the exact form and manner in which the same were received by Assignor. Any collections received by Assignor from any Account debtor owing on any Assigned Account, whether or not then due, shall be presumed applicable to such Assigned Account.   .   .   .

Security Agreement Rider ¶ 8, plaintiff's Exhibit 203A. [x's in original].

In *Decker-Ruhl Ford Sales, Inc. v. Ford Motor Company*, 523 F.2d 833 (8 Cir. 1975), the Eighth Circuit considered virtually identical contract language and found that any failure of the Assignor to promptly tender monies to the Assignee was not only a prohibited delay, but also a breach of a fiduciary relationship.

Even assuming that the contract between GECC and ABP permitted a 10 day delay, the evidence before the Court indicates that most of the customer checks were used substantially more than 10 days. In addition, the evidence is clear that when the diversion was discovered both ABP and GECC treated it as a blatant violation of their agreement. The Court concludes that the diversion was in no ways contemplated or condoned under the credit agreement.

The Court is equally unpersuaded by defendants' contention that the diversion was, at most, a breach of contract for which there should be no criminal liability. They argue that interest was paid on all monies diverted by ABP and that the diversion was fully secured by various real estate mortgages. This case, however, goes far beyond willful breach of contract for which ABP could be liable for punitive damages. It is the intentional, deliberate, and planned concealment of the breach of contract that justifies the imposition of criminal sanctions. *United States v. George*, 477 F.2d 508 (7 Cir. 1973); *Epstein v. United*

*States*, 174 F.2d 754 (6 Cir. 1949). *Epstein, supra*, is highly instructive as it distinguishes "active" as opposed to "constructive" fraud, and calls for the imposition of criminal sanctions only in cases of active fraud.

> Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive. [Citations omitted]. . . . Constructive fraud is a breach of legal or equitable duty which in spite of the fact that there is no moral guilt resulting from the breach of duty, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence or to injure public interests. *Id.* at 765–766.

*In Accord, Post v. United States*, 132 U.S.App.D.C. 189, 407 F.2d 319 (1968), *cert. den.* 393 U.S. 1092, 89 S.Ct. 863, 21 L.Ed.2d 784; *Shushan v. United States*, 117 F.2d 110, 133 A.L.R. 1040 (5 Cir. 1941), *cert. den.* 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531, *reh. den.* 314 U.S. 706, 62 S.Ct. 53, 86 L.Ed. 564. The evidence presented in this case, in light of the governing legal principles stated above, convince the Court that the diversion of funds from GECC constituted actual fraud.

The defendants' last argument on the issue of fraud is that, had they intended to defraud GECC, the most expeditious method would have involved "phony" invoices. This argument misses the mark, as GECC auditors spot checked invoices every month to determine if they accurately reflected merchandise actually sold. Falsifying invoices clearly was not an available method of perpetrating the fraud, without incurring *a substantial* risk that the scheme would be detected.

■ Turning now to the element of specific intent, several witnesses testified to Mr. West's knowledge of the diversion. Mr. Taphorn stated he discussed the matter with Mr. West on six to twelve occasions [TR. 783–785]. Mr. Clark stated that he discussed the diver-sion with Mr. West on "numerous occasions" [TR. 1538]. Mr. West, predictably, denied that he was ever told [TR. 1939], but later admitted at least some knowledge of the diversion during cross-examination.

Q. Didn't he [Mr. Taphorn] recommend to you that you stop spending money on Dumas?

A. No.

Q. Didn't he on numerous occasions tell you you had to sell cattle that you were holding, your own cattle, so that you could pay back GE?

A. No.

I will explain if you would like. Mr. Taphorn would come to us and tell us he would be in trouble on his loan and be overextended.

Q. He would tell you you were overextended with GE?

A. I am not done.

That he is going to be in to GE, and he would ask us how many cattle we intended to kill, how many hours we intended to work, and from there we would figure out whether we had to kill less cattle or sell feed lot cattle and if the cattle were fat—we never sold cattle that wasn't fat. [TR. 2001].

Therefore, the evidence shows beyond a reasonable doubt, in the Court's mind, that Mr. West had personal knowledge of the diversion at least as early as June, 1974. He may not have known all of the details of the diversion, but the Court finds that he did know of the approximate size of the diversion each month; that it was effectuated by requesting customers to mail checks to the corporate headquarters, in violation of the credit agreement; and that it was necessary to transmit false information to GECC to maintain the diversion. At this juncture, it should be noted that Mr. West was the President, Chairman of the Board, and largest single stockholder of ABP. His office at ABP headquarters was the site of frequent informal meetings on all phases of the corporation. While his knowledge of the diversion cannot be imputed, these circumstantial

facts forcefully rebut Mr. West's testimony [TR. 1939] that he did not know of the diversion. *United States v. Interstate Engineering Corporation*, 288 F.Supp. 402, at 413 (D.N.H.1967); *Irwin v. United States*, 338 F.2d 770 (9 Cir. 1964), *cert. den.* 381 U.S. 911, 85 S.Ct. 1530, 14 L.Ed.2d 433; *United States v. Press*, 336 F.2d 1003 (2 Cir. 1964), *cert. den.* 379 U.S. 965, 85 S.Ct. 658, 13 L.Ed.2d 559; *Hofmann v. United States*, 353 F.2d 188 (10 Cir. 1965). Likewise, the Court finds clear evidence that the corporation is chargeable with knowledge of the diversion, as the intent and knowledge of its employees are imputed to it.

These facts and reasons convince the Court, beyond a reasonable doubt, that both Frank R. West and American Beef Packers devised a scheme or artifice to defraud GECC by means of false or fraudulent representations; and that Frank R. West and American Beef Packers acted with the specific intent to carry out some essential step in the execution of the scheme or artifice to defraud.

## SPECIFIC MAILINGS

Twenty-five counts relate to the diversion of funds from GECC [Counts 75 through 82, inclusive; 84 through 97, inclusive; and 99 through 101, inclusive], consisting of 7 counts alleging violations of 18 U.S.C. § 1343, and 15 counts alleging violations of 18 U.S.C. § 1341. § 1341 provides as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

§ 1343 provides as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

The essential elements of these two statutes are as follows:

§ 1341

1. The act or acts of having devised (or intended to devise) a scheme or artifice to defraud certain creditors and livestock feeders by means of false or fraudulent representations;

2. The act or acts of placing (or causing to be placed) in an authorized depository for mail matter a letter intended to be sent by the Postal Service; and

3. So using the mails willfully, and with the specific intent to carry out some essential step in the execution of the scheme or artifice to defraud.

§ 1343

1. The act or acts of having devised (or intended to devise) a scheme or artifice to defraud certain creditors and livestock

feeders by means of false or fraudulent representations;

2. The act or acts of transmitting (or causing to be transmitted) any signals or sounds by means of wire or radio communications;

3. That the transmission be in interstate commerce; and

4. So transmitting willfully, and with the specific intent to carry out some essential step in the execution of the scheme or artifice to defraud.

The Court will here relate the specifics of each mailing, phone call or wire transfer, in furtherance of the scheme or artifice to defraud. During the trial of this case, exhibits were numbered according to the count in the indictment to which they relate.

Mr. William Hoffman and Shirley Tatera, of Ed Miniat, Inc., testified to Counts 75 through 80. Exhibits 75 and 76 are wire transfers and the invoices paid therewith. These wire transfers to the ABP headquarters were at the request of ABP and the funds were used for 10 and 20 days, respectively, before being forwarded to GECC. There are deposit slips in Exhibit 401 showing these funds being deposited in the Northwestern National Bank on the respective day the wire transfer was made. Alfred Drake, controller at the Northwestern National Bank, testified that all of the deposit slips contained in Exhibit 401 represent money wire transferred into the defendants' bank account. Contained in Exhibit 400 are wire transfer records which reflect the date on which the above described funds were transferred from the Northwestern National Bank to the ONB account of GECC. Again, these records show the date the transfer was made. Mr. Hoffman further testified that Herbert Schrader requested that these particular wire transfers be made. An examination of the invoices paid by these particular wire transfers shows that these payments should have been remitted to the GECC lockbox in Cleveland, Ohio.

Counts 77 through 80 all involve checks which again were mailed to the defendants' headquarters in Omaha, rather than the GECC lockbox in Cleveland. Exhibits 77 and 78 even have the Cleveland address on them, but the endorsement shows they were deposited into the Northwestern National Bank in Omaha, Nebraska, indicating that Miniat had prepared these checks for mailing to the GECC lockbox, but that before the checks were mailed they were instructed to send them to Omaha instead. In Exhibit 403 are the respective deposit slips showing the date of deposit of these items into the Northwestern National Bank, while Exhibit 400 contains the wire transfer records reflecting the date of transfer to GECC. Exhibits 79 and 80 are checks reflecting similar transactions charged in Counts 79 and 80.

Count 81 and Counts 84 through 88 are established by Exhibits 81 and 84 through 88, as well as the testimony of Shirley Tatera. Mrs. Tatera testified that all of these checks are mailed on or about the day they are prepared. Again, Herbert Schrader testified that he would call this company and request them to mail the checks to Omaha, rather than the lockbox identified on their invoice. The funds represented by these wire transfers and checks were used by American Beef Packers for anywhere from 7–42 days, and may be traced through the Northwestern National Bank and eventually into the ONB by examining the bank records in evidence.

Counts 89 through 97 are established again by the bank records, Exhibits 89 through 97, and the testimony of John Wallant, Vice President of the Glen and Anderson Company of Chicago. Mr. Wallant identified the Exhibits 89 through 97 as either wire transfer records or checks remitted by Glen and Anderson to ABP, together with invoices. He testified that they would normally send their payment to the place designated on the defendants' invoice, but that these occasions Herb Schrader called him and had him mail the checks to Omaha. He further testified that in the company's normal course of business, the checks would be mailed out on or about the date they are typed.

Counts 89, 90 and 91 are all wire transfers of funds from Glen & Anderson in Chicago to the defendants' account at the Northwestern National Bank, Omaha, Nebraska. Exhibits 89, 90 and 91 are records of the amount and date of these wires. Again, the invoices reflect the remittances should have gone to the GECC lockbox in Cleveland. Exhibit 401 contains the deposit slips showing that these funds were deposited into the ABP's account at the Northwestern National Bank. The records reflect that these funds were diverted for 20, 31 and 26 days respectively.

Counts 92 through 97 are all Glen & Anderson checks that were mailed to the defendants' headquarters and followed the same diversion pattern, and were diverted for periods up to 20 days. Again, the invoices reflect that these checks should have been remitted to the GECC lockbox in accordance with their agreement. These funds may be traced through the Northwestern National Bank and eventually into the ONB by examining the bank records in evidence.

Count 97 [Exhibit 97] involves a check dated January 3, 1975. This particular check is one that the defendants diverted from GECC and differs from the others in that it was later in time. Between December 13, 1974 and January 3, 1975, there is no evidence of funds being diverted from GECC, as the GECC auditors were constantly in the defendants' headquarters and closely observing their activity. This particular check shows that on January 3, 1975, the defendants again started to divert funds from GECC.

Counts 99, 100 and 101 are established by Exhibits 99A and B, 100 and 101, as well as the bank records and the testimony of Everary Eilers, an employee of Safeway Stores. It is clear from examining the exhibits and endorsements thereon that the three checks were sent to the defendants' headquarters, rather than to the lockbox indicated on the invoice. Even though Exhibit 100 has the Cleveland address on it, the endorsement shows it was deposited into the Northwestern National Bank. This again indicates the check was diverted from the lockbox after it was prepared. The deposit slip for this particular check, contained in Exhibit 403, reflects the check was deposited into the defendants' account on September 3, 1974. The wire transfer record contained in Exhibit 400 reflects this money was transferred to the GECC account on September 16, 1974, indicating that this money, in excess of one million dollars, was used by the defendants for 13 days before it was remitted to GECC. Mr. Eilers further testified that in the normal course of the company's business the checks are mailed on or about the day they are typed.

At this juncture, it should be noted that these 25 counts do not represent the only checks diverted. Exhibits 338A, 339A, 340A and 337A contain numerous checks that were also diverted, but on which the defendants have not been indicted. The evidence is overwhelming, and convinces the Court beyond a reasonable doubt that the mailings and interstate wire transfers alleged in Counts 75, 76, 77, 78, 79, 80, 81, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 99, 100 and 101 did in fact occur; that they were essential steps in furtherance of a scheme or artifice to defraud; and that they were foreseeably done or caused to be done by the defendants, Frank R. West and American Beef Packers, having the specific intent to defraud.

Each of the essential elements as to these counts having been proved beyond a reasonable doubt, the Court finds the defendants, Frank R. West and American Beef Packers, guilty as charged in Counts 75, 76, 77, 78, 79, 80, 81, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 99, 100 and 101.

American Beef Packers (but not Frank West) also stands charged in 4 counts of mailing false financial statements to GECC. Exhibits 71, 72, 73 and 74 are ABP financial statements mailed near the end of June, July, August and October, 1974, respectively. Mr. Diederich established the date of receipt and that they had been mailed. As previously stated, these statements were materially false and were mailed with the specific intent to defraud, in furtherance of and as an essential step in the scheme or

artifice to defraud GECC. Each of the essential elements as to these counts having been proved beyond a reasonable doubt, the Court finds the defendant American Beef Packers, guilty as charged in Counts 71, 72, 73 and 74.

Turning now to those counts alleging events which occurred after December 16, 1975 (after the diversion was discovered) the Court can posit criminal liability only if there was proved a scheme or artifice to defraud. Except for the one check charged in Count 97, the scheme to divert monies from GECC ended on December 16. In essence, the prosecution charges that the defendants devised another scheme or artifice consisting of a planned bankruptcy. There is evidence in the record supporting the Government's theory; however, it was insufficient, as a matter of law, to form the basis of guilt beyond a reasonable doubt. Proof of a scheme or artifice to defraud is, at best, a difficult task, and usually must be attempted with conflicting circumstantial evidence. Such was the case here. The record shows that someone at ABP ordered the special envelopes used in the bankruptcy on December 31, 1974 —three working days (seven full days)— before the filing of bankruptcy. Also, on December 31, at the ABP Board of Directors meeting the possibility of bankruptcy as an option of last resort was discussed. In addition, ABP had considerable difficulty arranging for the payment of checks at the Northwestern National Bank.

The next working day, January 2, 1975, was uneventful, and ABP was able to meet its commitments to the Northwestern National Bank. On the afternoon of January 3, ABP's inability to meet its debts as they matured became plainly evident and some cattle were purchased after that time. Likewise, when the cattle were slaughtered on the 6th, ABP was in dire financial straits. Although this evidence admits the possibility of fraud, it must be remembered that there is considerable exculpatory evidence on the issue of intent to defraud, and even the evidence against the defendants is subject to varying interpretations. The special envelopes were not received by ABP until January 10. Had the bankruptcy been planned as a scheme to defraud, these envelopes, essential to a scheme, would have been ordered sufficiently in advance so as to insure they would be available on the day bankruptcy was filed. Likewise, there is undisputed evidence that the volume of livestock purchased and slaughtered from January 3 through January 6 was smaller than usual. One would expect a high volume of purchases if bankruptcy were planned, so as to reap the maximum revenue. Cattle purchases on the 6th would also be expected. Likewise, one would expect orderly and systematic preparation, rather than the confusion and indecision so evident in the record.

■ It is the Court's considered judgment that the evidence readily supports a finding that the management and employees of ABP exercised poor business judgment. They were tardy in realizing the extent of their financial plight, and overly optimistic in expecting GECC to loan further funds. In considering a directed verdict, the Government is entitled to the benefit of all reasonable inferences to be drawn from the evidence. However, where the evidence is equally strong to infer innocence as it is to infer guilt, a directed verdict of acquittal is not only proper, but mandated. *United States v. Kelton*, 446 F.2d 669 (8 Cir. 1971); *Epstein v. United States*, 174 F.2d 754 (6 Cir. 1949). The Court's ruling in dismissing these counts, at the close of all the evidence, should in no way indicate that the Court condones the conduct of the defendants. What may be admirable courage and optimism in a small businessman may well be reckless mismanagement in a corporation the size of ABP. It must be remembered that the existence of a scheme to defraud is an essential element of the crime charged— recklessness, reprehensible as it may be, is insufficient. The impact of ABP's failure on the cattle business was far reaching; but this fact is immaterial to the Court's decision, as the criminal statutes involved in this case must be applied evenly, without regard to the financial injury resulting from the defend-

ants' conduct. In every bankruptcy, there are unpaid creditors who, under the law, bear the financial burden of the bankrupt's errors. The size of the burden, by itself, raises no inference of a scheme to defraud. The Court, therefore, reaffirms the directed verdict of acquittal entered at the close of all the evidence, [as to Frank West on Counts 1 through 74, inclusive; 83 and 98; and 102 through 105, inclusive; and as to ABP on Counts 1 through 40, inclusive; 48 through 70, inclusive; 83 and 98; and 102 through 104, inclusive].

ABP's transactions with the Chapman Cattle Company stand on a different footing. Mr. Chapman, unlike the other cattle feeders, realized on January 7 that ABP might not be able to pay for the cattle purchased three days earlier. In his efforts to have the cattle paid for, returned, or identified for attachment purposes, he was totally frustrated by ABP. See U.C.C. §§ 2–703, 2–704, and 2–705. Counts 43 through 47, inclusive, are clearly supported by the evidence. Brent DaBell, manager of ABP's Fort Morgan plant, repeatedly deceived and stalled both Mr. Chapman and Duane Von Seggern. At least at the Fort Morgan plant, there was in existence a scheme to defraud Mr. Chapman, consisting of a plan to falsely maintain that ABP was not in *any* financial difficulty; to delay presentment of Mr. Chapman's check [Exhibit 41G]; and to deliberately and purposefully resist efforts to identify the cattle. There is, however, only equally balanced evidence on Counts 41 and 42. Count 41, charging the transportation of the cattle, and Count 42, charging a telephone call in which Mr. Von Seggern was told that ABP was not going to kill on the 7th, stand on the same analysis as those counts dismissed by the Court at the close of all the evidence.

As to Count 47, the Court has carefully considered the principles enunciated in *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) and concludes that a judgment of acquittal is required as to this count. The telephone call charged in Count 47 occurred after the petition for bankruptcy was filed, and furthermore there is no evidence that Mr. Chapman's cattle were still at Fort Morgan when the call was made. It is, therefore, quite possible that the scheme to defraud Mr. Chapman was completed at the time of the call and that the call was not essential to the fruition of the scheme.

The defendant, ABP, contends the Government must prove the particular person within ABP having the requisite specific intent to defraud. Even if such was the law, the evidence clearly shows that Mr. DaBell, plant manager, had the requisite specific intend to defraud, and the Court finds that he was a member of ABP's central management, so as to make his conduct and intent properly referable to the corporation.

These findings of fact and conclusions of law convince the Court, beyond a reasonable doubt, that the interstate telephone calls alleged in Counts 43, 44, 45 and 46 did, in fact occur; that they were essential steps in furtherance of a scheme or artifice to defraud; and that they were done or caused to be done purposefully, with the specific intent to defraud. Each of the essential elements as to these counts having been proved beyond a reasonable doubt, the Court finds the defendant, American Beef Packers, guilty as charged in Counts 43, 44 and 45.

As to Counts 41, 42 and 47, the Court finds the defendant, American Beef Packers, not guilty.

Two orders, in accordance with the specific findings of fact and conclusions of law stated herein, are filed contemporaneously herewith.