UNITED STATES of America, Appellee,

v.

Frank R. WEST, Appellant.

UNITED STATES of America, Appellee,

v.

AMERICAN BEEF PACKERS, INC., Appellant.

Nos. 76–1410, 76–1411.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1976.

Decided Feb. 10, 1977.

Certiorari Denied April 4, 1977.
See 97 S.Ct. 1601.

James P. Linn, Oklahoma City, Okl., for West.

Lyle E. Strom, Omaha, Neb., for ABP, Inc.; C. L. Robinson and Bruce H. Brodkey, Omaha, Neb., on brief.

Michael L. Schleich, Asst. U. S. Atty., Omaha, Neb., for appellee; Daniel E. Wherry, U. S. Atty., Omaha, Neb., on brief.

Before MATTHES, Senior Circuit Judge, and STEPHENSON and WEBSTER, Circuit Judges.

MATTHES, Senior Circuit Judge.

This prosecution is premised on a 105-count indictment filed on August 8, 1975, in the United States District Court for. the District of Nebraska. The original named defendants were Frank R. West, Robert E. Lee, American Beef Packers, Inc. (ABP), and Beefland International, Inc. (BI). Forty-three counts of the indictment alleged that the defendants used or caused to be used the mails in furtherance of an alleged scheme or artifice to defraud, in violation of 18 U.S.C. § 1341; thirty-two counts charged the use of wire communications (telephone) to further the scheme, in violation of 18 U.S.C. § 1343; twenty-nine counts charged transportation of livestock in interstate commerce knowing the same to have been obtained through fraudulent means, in violation of 18 U.S.C. § 2314; and one count, No. 105, alleged that defendants West and Lee conspired with each other and with other named individuals to violate 18 U.S.C. §§ 1341, 1343 and 2314, all in violation of 18 U.S.C. § 371.

As is typical of prosecutions involving a scheme to defraud, and use of the mails, wire communications and interstate transportation of property in furtherance of the scheme, the indictment was complex; it alleged that the defendants, aided and abetted by each other, devised a scheme and artifice to fraudulently obtain cattle, hogs, money, and other items of value in excess of $20,000,000[1] from a large number of persons, firms, partnerships, cooperatives and corporations in different states.

1. The first 10½ pages of the indictment detailed the acts and activities of the defendants which comprised the scheme and artifice to defraud. The *attempt* to defraud General Electric Credit Corporation (GECC), more fully discussed below, constituted a substantial part of the scheme. The attempt to defraud cattle and hog feeders and producers constituted another substantial part of the scheme. Attached to the indictment as Exhibit A is a list of accounts payable for livestock allegedly purchased by the defendants. The number is staggering, as shown by the following summary of accounts payable to cattle and hog feeders and producers in thirteen states, taken from Exhibit A of the indictment:

| State | Number Of Accounts Payable | Range Of Amounts Owing To Livestock Feeders And Producers | | |
|---|---|---|---|---|
| California | 1 | | | $ 20,550.68 |
| Colorado | 53 | from $ | 26.90 to | 271,742.76 |
| Indiana | 1 | | | 26,785.84 |
| Iowa | 714 | from | 13.07 to | 118,997.28 |
| Kansas | 52 | from | 20.00 to | 159,647.82 |
| Missouri | 38 | from | 39.42 to | 55,137.82 |
| Minnesota | 1 | | | 55,813.21 |
| Nebraska | 267 | from | 14.00 to | 573,717.13 |
| New Mexico | 2 | from | 1,133.74 to | 31,016.96 |
| Oklahoma | 11 | from | 231.02 to | 271,270.81 |
| South Dakota | 21 | from | 31.13 to | 259,217.94 |
| Texas | 41 | from | 100.00 to | 415,469.35 |
| Wyoming | 2 | from | 8,413.93 to | 150,348.76 |

Early in the case the district court granted defendants' waiver of a jury trial.

Following extensive discovery proceedings, the trial commenced before the Honorable Robert V. Denney on October 14, 1975 and continued with only necessary interruptions for fourteen days. Approximately sixty-four witnesses testified, sixty for the government and four for the defendants. In an effort to shorten the trial, the parties stipulated to the substance of the testimony of a number of government witnesses who were not called to testify.[2]

At the close of the government's case, the court dismissed Counts 32, 33, 34, 35, 49, 51, 57, 58, 62, 63, 66 and 68 upon the government's motion because there was not sufficient evidence "adduced to sustain these particular counts." In response to motions of all of the defendants to dismiss all counts, the court then dismissed the indictment against defendant Lee because of insufficient evidence.

At the close of all the evidence, the court upon renewed motions of the remaining defendants dismissed all counts of the indictment against BI because "it is a wholly-owned subsidiary of American Beef Packers, Inc., and American Beef Packers, Inc. is the true defendant in this case." Tr., Vol. 25, at 2094. The court simultaneously dismissed the indictment as to West on Counts "1 through 15, inclusive, relating to the bounced checks and DTC's, and Counts 16 to 74, inclusive, relating to purchase of cattle, Counts 83 and 98, letters with bankruptcy order, Counts 102 to 104 relating to goods in warehouse, and Count 105, conspiracy . . ." because of insufficient evidence on these counts. Tr., Vol. 25, at 2094. The court dismissed the indictment as to ABP on "Counts 1 to 15 relating to bounced checks and DTC's . . ., Counts 16 to 40 and 48 to 70 on purchase of cattle

. . . ; Counts 83 and 98, letters of bankruptcy order . . ., Counts 102 to 104 relating to goods in warehouse, and Count 105 as to conspiracy . . .". Tr., Vol. 25, at 2095.

Thereafter, the court filed an exhaustive opinion, *United States v. West*, 407 F.Supp. 1148 (D.Neb.1976), and entered two judgments, one finding West guilty as to Counts 75 through 81, 84 through 97, 100 and 101, and not guilty as to Count 82. In the other judgment the court found ABP guilty as to Counts 43 through 46 (relating to purchase of Chapman cattle, discussed *infra*), 71 through 81, 84 through 97, and 99 through 101, and not guilty as to Counts 41 and 42, 47 and 82. The court dismissed all of the remaining counts, including all counts relating to the purchase of livestock from all feeders and producers except Chapman. The court sentenced West to two years imprisonment on each count with the sentences to run concurrently, and assessed a fine of $1,000 on each count. West was also directed to pay one-half of the costs of prosecution. However, the court suspended execution of the sentence of imprisonment and placed West on probation for a period of two years.

ABP was fined $100 on each count and directed to pay one-half of the costs of prosecution.

West and ABP, represented by different counsel, filed notices of appeal, filed briefs in this court, and presented separate arguments.

I

The district court's detailed findings of fact obviate the necessity of another full description of the various and sundry activities and machinations of appellants which ultimately resulted in the virtual termination of ABP's principal source of financial

---

2. It is thus understandable that a voluminous record was compiled. In addition to approximately 203 exhibits which were received into evidence, 31 volumes of pretrial and trial proceedings were recorded. We have carefully read and considered all of the pretrial proceedings, the testimony, a number of exhibits and pertinent parts of the two volumes of pleadings.

aid and led to appellants' encounter with the law. A brief summary of the facts is necessary, however, for a full understanding of the principal issue presented by this appeal: whether the evidence was sufficient to warrant the finding that appellants devised a scheme or artifice to defraud their creditors, particularly GECC.

The indictment alleged that the scheme to defraud had its inception "from on or about the first day of June, 1974." A considerable part of the indictment delineated the participation by appellants, as well as the two dismissed defendant, in setting up the financing arrangement between ABP and GECC. The history of ABP's financing arrangements, particularly as it related to GECC, is explored at length by the district court, 407 F.Supp. at 1149–50. ABP's large-scale operations required a substantial amount of capital. A credit agreement between ABP and GECC, which enabled ABP to acquire virtually all of its working capital from GECC, was entered into on June 28, 1972. 407 F.Supp. at 1149. Under this agreement, GECC extended a $41,000,000 revolving line of credit secured by accounts receivable of ABP, and a $13,000,000 long-term loan secured by other property such as deeds of trust or mortgages on real estate. As ABP's business expanded, it was troubled by a lack of funds to operate on a sound fiscal basis, particularly a lack of sufficient funds to pay for the large quantities of livestock purchased daily by ABP from cattle dealers. This led to the diversion of funds due ABP from the lock boxes controlled by GECC, described in the district court's opinion, 407 F.Supp. at 1149–51. Checks due from ABP's customers customarily sent to GECC via the lock boxes were, at the specific directions of ABP's key officers in charge of the finance department, forwarded directly to ABP, which, in turn, used the funds in its operations. Funds wrongfully diverted amounted to approximately $6,000,000 on occasions between June 1974 and December 13, 1974, the date when GECC learned of the diver-

sions. The events that ensued after December 13 are reviewed in the district court's opinion, 407 F.Supp. at 1152–57. As found by the court and as shown by the record, ABP filed a Chapter XI bankruptcy petition on January 7, 1975.[3]

■ In assessing the sufficiency of the evidence, we view the evidence in the light most favorable to the government, and afford the government the benefit of all reasonable inferences to be drawn from the evidence. See Glasser v. United States, 315 U.S. 60 at 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Pilla, 550 F.2d 1085 (8th Cir., 1977); United States v. Whiting, 538 F.2d 220, 223 (8th Cir. 1976); United States v. Swanson, 509 F.2d 1205 (8th Cir. 1975). Factual findings of the district court relating to matters other than the ultimate question of guilt must stand unless such findings are clearly erroneous. See Campbell v. United States, 373 U.S. 487, 493, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963); Kilcrease v. United States, 457 F.2d 1328, 1331 (8th Cir. 1972). We conclude from our study of the voluminous record that the evidence was clearly sufficient.

### A

#### Claim that there was no proof of intent to defraud

■ Appellants first challenge the sufficiency of the evidence to establish intent to defraud. Appellants concede that accounts receivable were in fact diverted. They argue, however, that the diversions were not accomplished as the result of a scheme or artifice to defraud within the meaning of 18 U.S.C. §§ 1341 and 1343, but rather that at most they constituted a breach of contract which would possibly subject appellants to civil liability.

With respect to the question of whether there was the requisite intent to establish criminal responsibility, Judge Denney concluded:

---

**3.** The record shows that ABP has been authorized to continue to operate its business under the jurisdiction of the bankruptcy court.

This case . . . goes far beyond willful breach of contract for which ABP could be liable for punitive damages. It is the intentional, deliberate, and planned concealment of the breach of contract that justifies the imposition of criminal sanctions. *United States v. George,* 477 F.2d 508 (7 Cir. 1973); *Epstein v. United States,* 174 F.2d 754 (6 Cir. 1949). *Epstein, supra,* is highly instructive as it distinguishes "active" as opposed to "constructive" fraud, and calls for the imposition of criminal sanctions only in cases of active fraud.

"Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive. [Citations omitted]. . . . Constructive fraud is a breach of legal or equitable duty which in spite of the fact that there is no moral guilt resulting from the breach of duty, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence or to injure public interests." *Id.* at 765–766.

407 F.Supp. at 1159–60.

The district court, after describing the actions of West and ABP in breaching the contract with GECC and thereafter concealing the breach, held that

These facts and reasons convince the Court, beyond a reasonable doubt, that both Frank R. West and American Beef Packers devised a scheme or artifice to defraud GECC by means of false or fraudulent representations; and that Frank R. West and American Beef Packers acted with the specific intent to carry out some essential step in the execution of the scheme or artifice to defraud.

407 F.Supp. at 1161.

The district court's summary of the actions of West and ABP in effecting and concealing the breach of contract is fully supported by the record. Our independent review of the evidence satisfies us that the district court's finding as to intent to defraud is supported by sufficient evidence, and that its conclusion was not induced by a misconception of the applicable law.

■ Related to appellants' contention that there was insufficient evidence of intent to defraud is their allegation that GECC was fully aware of the diversions from the outset and that such knowledge was fatal to the existence of the claimed fraudulent scheme. One of appellants' key contentions is that, once the diversions began, ABP began depositing funds payable to GECC in a certain bank account in much larger amounts than had previously been the case, and that the amount of such deposits put GECC on notice that the source of such deposits had to be accounts receivable improperly diverted by ABP.

Certain factual background is necessary for an understanding of appellants' contention. Pursuant to a mutual understanding between ABP and GECC, a lock box had been established at the Omaha National Bank for funds due GECC on accounts receivable. The establishment of this lock box was in part necessitated by the fact that some customers failed to send their remittances to the appropriate lock box, instead sending payment directly to ABP. Amounts received by ABP in such manner were to be immediately deposited by ABP in the Omaha National Bank lock box. After the diversions began, whenever ABP was ready to pay back the wrongfully withheld funds, it would do so by transferring the diverted funds from its bank account at the Northwestern National Bank of Omaha to the Omaha National Bank lock box.

Appellants' contention is troublesome; however, after a review of the evidence, we are persuaded that the government established sufficient evidence to explain the reasonableness of GECC's lack of knowledge in the face of these facts. The evidence and reasonable inferences therefrom establish that ABP adopted a practice designed to shield its manipulations of the accounts receivable. An ABP employee, whose duty was to deposit checks received from customers in the appropriate account,

was instructed by her superior to, in effect, keep two sets of records and not show GECC auditors copies of deposit slips reflecting deposits in ABP's Northwestern National Bank account. Additionally, there was evidence and the district court found that false financial statements were sent to GECC which had the effect of lulling the latter into believing that ABP was adhering to the lending agreement insofar as it related to accounts receivable. These practices were not consistent with fair dealing, were contrary to the terms of the lending agreement, and militate against appellants' theory of knowledge by GECC.

Finally, in addition to the evidence reflecting that ABP actively sought to disguise its activities, the government also introduced evidence that, when a transfer of funds was made from the Northwestern National Bank to the Omaha National Bank, ABP would inform GECC that a number of receivables had come in and would inform it as to which accounts were paid. However, the Chicago office of GECC, which monitored the status of the ABP accounts, was given only the gross amount that had been put into the bank. The actual statement of deposits went to the GECC treasury office in Stamford, Connecticut, which had no reason to question the amounts received. While GECC employees might have been able to discover the diversions had they been more vigilant, in view of the overwhelming evidence setting out appellants' sophisticated methods of disguising their activities, we find the evidence that GECC lacked knowledge of the scheme to be convincing.

B

*West's claim of lack of knowledge*

 West alleges that the evidence was insufficient to show that he had knowledge of the scheme. We disagree. There was substantial direct evidence that West had actual knowledge of the wrongful diversions. James A. Taphorn, vice-president of finance of ABP, testified that the diversions of accounts receivable occurred at least twenty times during his tenure, that

he discussed the diversions with West on from six to twelve occasions, and that he finally resigned in June 1974 because of his inability to obtain the large amounts of cash essential to the successful operations of ABP. Taphorn specifically testified that prior to June 1974 he told West:

> Well, basically that we were into GECC for a couple of million bucks and we got to get them paid back.

Tr., Vol. 9, at 783.

Tom Clark, who succeeded Taphorn, testified under a grant of immunity that he learned of the diversions in August or September, 1974 and that he discussed the matter with West on numerous occasions. Clark stated: "We are on a treadmill." Tr., Vol. 18, at 1542.

Although West denied actual knowledge of the diversion scheme, the district judge, in the exercise of his prerogative, declined to credit West's testimony and pointed out that some of West's testimony indicated knowledge on his part. 407 F.Supp. at 1160. Moreover, West ·was the president, principal stockholder and general manager of ABP. He received an annual salary of $150,000 prior to and at the time the Chapter XI bankruptcy petition was filed. It would strain credulity and defy logic to conclude that the key officer of a corporation would not be generally familiar with the financial affairs of the company and keep himself informed of its practices in obtaining funds necessary to operate business on a day-to-day basis. The district court properly considered the circumstance of West's position in the corporation in deciding the question of knowledge. 407 F.Supp. at 1160–61.

II

ABP contends that it "was not convicted of the scheme or artifice to defraud alleged in the indictment," and that consequently the judgment finding it guilty cannot stand. Much is said in ABP's brief in an attempt to persuade us to rule favorably on this claim of prejudicial error. Stripped of all nonessential verbiage, the argument

amounts to nothing more than a claim of a fatal variance between the indictment and the evidence. ABP contends that the indictment in reality charged two schemes— one to defraud GECC through the wrongful diversion of accounts receivable, and the other to defraud numerous other creditors of ABP by collecting money and assets with the intention of going into bankruptcy. Because ABP was found guilty of only those counts relating to the scheme to defraud GECC and those relating to the Chapman cattle discussed more fully *infra*, it is asserted that there was a fatal variance.

Viewing the record in the light of firmly established principles, we conclude that this contention should be rejected.

█ It is well established that "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him". *Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960), *citing Ex Parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887). Whether the defendant has been required to defend a charge not made against him must of necessity be determined by consideration of the whole record. More than fifty years ago this court considered the question of fatal variance in *Mathews v. United States*, 15 F.2d 139 (8th Cir. 1926). There, the court stated:

> Variance is a difference or disagreement between the essential parts of a legal proceeding, that to be effectual must agree with each other. In its common form in criminal procedure it is a disagreement between the allegations of the indictment and the proof. This disagreement must be in some matter which in point of law is essential to the charge. (Citations omitted.)

> Tests of fatal variance are: Was defendant misled? Will defendant be protected against a future proceeding? (Citations omitted.) "Upon the question of variance between indictment and proofs, the controlling consideration should be whether the charge was fairly and fully enough stated to apprise defendant of what he must meet, and to protect him

against another prosecution, and whether those particulars in which the proof may differ in form from the charge support the conclusion that respondent could have been misled to his injury."

15 F.2d at 142–43.

The substance of the holding in *Mathews* was restated by this court in *United States v. Schrenzel*, 462 F.2d 765, 769 (8th Cir.), *cert. denied*, 409 U.S. 984, 93 S.Ct. 325, 34 L.Ed.2d 248 (1972):

> [T]he "true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).

We agree with the government that ABP's variance argument is tantamount to an assertion that it was necessary to prove each and every element of the alleged scheme. It is settled doctrine, however, that the government is not required to prove all the elements. "A scheme to defraud is necessarily made up of numerous elements. No particular element need be proved if sufficient is shown to constitute the scheme to defraud." *Baker v. United States*, 115 F.2d 533 at 542 (8th Cir. 1940), *cert. denied*, 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128 (1941), *quoting Cowl v. United States*, 35 F.2d 794, 798 (8th Cir. 1929); *Schaefer v. United States*, 265 F.2d 750, 753–54 (8th Cir.), *cert. denied*, 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82 (1959); *Holmes v. United States*, 134 F.2d 125, 133 (8th Cir.), *cert. denied*, 319 U.S. 776, 63 S.Ct. 1434, 87 L.Ed. 1722 (1943). As Judge Coffin aptly observed in *New England Enterprises, Inc. v. United States*, 400 F.2d 58 (1st Cir. 1968), *cert. denied*, 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969):

> Viewing the record as a whole, we can only conclude that the process complained of appears to have been little more than a whittling down of the prosecution's weapons. Of the twenty substantive paragraphs in Count I, incorporated in all other counts by reference, eleven were struck in whole and five in part. Only

four remained intact. And, as a consequence of this, of the several theories of fraud alleged by the Grand Jury only one reached the trial jury. We think appellants' right to be informed of the nature of the charge against them was adequately protected. *Id.* at 65.

■ Here, the indictment unequivocally alleged the segments of the scheme of which ABP was convicted. It was bound to know from the indictment and the bill of particulars that appellants were charged with devising a scheme to defraud ABP's creditors, including GECC, and with using the mails and wires to further and carry out the scheme. The district court concluded that the evidence was insufficient to prove appellants' guilt beyond a reasonable doubt on a number of the counts. But such action does not constitute a fatal variance between the indictment and the proof. Indeed, we fail to perceive any prejudice to appellants resulting from their acquittal on a substantial number of counts which were related solely to certain segments of the scheme to defraud. *See* F.R.Cr.P. 52.

## III

■ We also reject appellant West's contention that the findings and judgments of the court are inconsistent, contrary to law, and that a reversal is therefore required.[4] West's argument, to the extent that it is independent of his contention that the evidence was insufficient to sustain his conviction,[5] is that a finding of no conspiracy mandates a finding of not guilty of the substantive counts. He relies upon *United States v. Maybury*, 274 F.2d 899 (2d Cir. 1960), where, under the facts presented, Judges Friendly and Lumbard were of the view that in a judge-tried case, the rule generally allowing inconsistencies in a jury verdict should not prevail. But, *cf. United States v. Dovico*, 329 F.2d 52 (2d Cir. 1964);

*United States v. Robinson*, 320 F.2d 880 (2d Cir. 1963).

We reject West's claim. As we have recently pointed out in *United States v. Donahue*, 539 F.2d 1131 (8th Cir. 1976):

In *Isaacs v. United States*, 301 F.2d 706, 725 (8th Cir.), *cert. denied*, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962), this court said that the substantive offenses proscribed by the mail fraud and wire fraud statutes are closely related to the offense of conspiracy described in 18 U.S.C. § 371. There are, however, differences between a substantive violation of one of the statutes in question and a conspiracy to violate it.

539 F.2d at 1135.

The fact that the court found appellant West guilty of certain of the substantive counts but not of the conspiracy count does not mean necessarily that the verdicts are inconsistent, as West appears to contend.

■ Further, assuming *arguendo* that the verdicts were inconsistent, we decline to follow *Maybury*, but adhere to the general rule that consistency between the verdicts on a multiple-count indictment is unnecessary when a defendant is convicted on one or more counts but acquitted on the remainder. *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *Batsell v. United States*, 403 F.2d 395, 400 (8th Cir. 1968), *cert. denied*, 393 U.S. 1094, 89 S.Ct. 865, 21 L.Ed.2d 785 (1969); *McElheny v. United States*, 146 F.2d 932 (9th Cir. 1944); Annot. 18 A.L.R.3d 274 (1968).

## IV

Appellants lodge an attack against the indictment, asserting it was rendered invalid by unconstitutional acts and proceedings. A review of the history of the indictment discloses the basis for this issue.

---

4. Appellant ABP also alleges that the verdict finding it guilty as to Counts 43–46 is inconsistent with the verdict finding it not guilty of those counts alleging a scheme to defraud the other livestock feeders and producers. Be-

cause we reverse as to those counts, we need not consider ABP's allegation.

5. We have already rejected this sufficiency of the evidence claim in Part I, *infra.*

Motions were filed to quash the indictment. In an accompanying affidavit, an attorney for ABP stated, on information and belief, that a grand jury impaneled on December 12, 1973, had heard testimony of more than fifty witnesses; that the grand jury was discharged on June 12, 1975, without "handing down" an indictment; that a second grand jury was impaneled on August 5, 1975; and that on August 8, 1975, it returned the indictment which is the subject of appellants' attack. The allegations in the affidavit focused upon the fact that the second grand jury did not hear the testimony of witnesses who had personal knowledge of the events alleged to be constituent elements of the scheme or artifice to defraud.

Appellants' position may be summarized as follows: (1) since the first grand jury failed to indict after hearing numerous witnesses over a span of nearly two months, the subject indictment is invalid because the second grand jury deliberated only three days before returning the indictment and appellants were thus denied their right to a full investigation by the grand jury of each of the separate charges of the indictment; and (2) the indictment was improperly based on excessive use of hearsay. Appellants assert that the indictment deprived them of their constitutional right to be tried on a lawful indictment and likewise denied them due process of law.

After an *in camera* hearing, the court determined that the indictment was valid and, accordingly, denied the motions to quash. We hold that appellants have not sustained their burden of showing the indictment was invalid.

Initially we point out that there is a strong presumption of regularity accorded to the findings of grand juries. *See Beatrice Foods Co. v. United States*, 312 F.2d 29, 39 (8th Cir. 1963). An indictment regular on its face, returned by a legally constituted grand jury, is presumed to be founded on competent evidence and a heavy burden is placed on one who seeks to overcome the presumption. *Martin v. United States*, 335 F.2d 945, 949 (9th Cir. 1964); *Cochran v. United States,* 310 F.2d 585, 590 (8th Cir. 1962); *Blumenfield v. United States*, 284 F.2d 46, 50 (8th Cir. 1960). Moreover, an indictment based solely on hearsay evidence does not violate the provisions of the fifth amendment. *See Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956);[6] *United States v. Akin*, 464 F.2d 7, 8 (8th Cir.), *cert. denied*, 409 U.S. 981, 93 S.Ct. 315, 34 L.Ed.2d 244 (1972). Finally, we note that the fact that the first grand jury failed to indict appellants is not in and of itself legally significant. *United States v. Gross*, 416 F.2d 1205, 1210 (8th Cir. 1969), *cert. denied*, 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427 (1970) (failure by two previous grand juries to indict did not bar later indictment by third grand jury).

In our view the evidence submitted in support of the motions to quash was not adequate to bring this case within the narrow and limited situations in which a defendant may successfully attack the indictment.[7] The affidavit accompanying the motions to quash did not contain allegations that the jury was illegally constituted; that the indictment was invalid on its face; that the indictment was obtained as a result of prosecutorial misconduct, *see United States*

6. ABP concedes in its brief that there is no "constitutional" limitation to prohibit an indictment based upon hearsay testimony of government witnesses. It cites cases from several circuits holding that the excessive use of hearsay testimony tends to destroy the important role of the grand jury and suggests that we apply that rule to this case. We find no basis for applying that rule here and decline the invitation.

7. In resisting the motions to quash, the United States Attorney insists, as he did in the district

court, that the supporting affidavit, being based solely on "information and belief", does not constitute the quantum of proof required to sustain the burden cast upon the movant as enunciated in the cases cited *supra*. There is precedent to sustain the government's position. *See Smith v. State of Mississippi*, 162 U.S. 592, 600, 16 S.Ct. 900, 40 L.Ed. 1082 (1896); *Kastel v. United States*, 23 F.2d 156, 158 (2d Cir. 1927), *cert. denied*, 277 U.S. 604, 48 S.Ct. 600, 72 L.Ed. 1010 (1928) (affidavit based solely on information and belief not sufficient).

*v. Gallo,* 394 F.Supp. 310 (D.Conn.1975); or that the trial court amended the original indictment so as to permit appellants to be tried on different charges, *see Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

The record of the *in camera* proceedings discussed previously further supports our conclusions. At the hearing the district judge diligently inquired into the proceedings of both grand juries, particularly the second one. The transcript of the testimony in the *in camera* hearing was sealed and forwarded to this court. Our examination of the transcript persuades us that neither the United States Attorney nor his assistant, both of whom testified under oath, pressured the grand jury for an indictment and that no deception or misrepresentations were made to induce the grand jury to act. The transcript shows that three government employees who had made an extensive investigation testified before the second grand jury as to every count in the indictment, that copies of the "majority" of the documentary evidence were available to the second grand jury, and that the second grand jury was informed that the first grand jury had heard evidence and had not returned an indictment. The court was informed during the hearing that no indictment was presented to the first grand jury because the investigation was incomplete and the term of the first grand jury expired on June 9 before the United States Attorney's Office had adequate time to prepare the lengthy indictment.

We agree with the district court that the presentation to the second grand jury was proper.

## V

ABP also complains that counsel for appellants were improperly denied an opportunity to participate in the *in camera* proceeding. ABP is apparently of the view that the district court should have conducted a plenary adversary inquiry into the deliberations of the second grand jury. We are satisfied, however, that in the absence of reasons more compelling than those presented by this record, the district court was not required to permit appellants to launch an adversary excursion into the proceedings of the second grand jury. The reason for the rule was stated by the Supreme Court in *Costello v. United States, supra* :

> If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before a trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

350 U.S. at 363, 76 S.Ct. at 409.

Finding that the appellants were not prejudiced by lack of an adversary hearing, we hold that their complaint does not require or warrant us to interfere with the course pursued in conducting the *in camera* hearing.

## VI

Finally, ABP contends that the district court should have acquitted it of Counts 43 through 46, which concern the Chapman cattle. As noted in the introductory part of this opinion, the indictment charged that West, ABP, and the two other defendants devised a scheme intended to defraud numerous persons, firms and corporations, including cattle feeders, of their property. Counts 41 through 47 are based upon that part of the scheme relating to cattle procured from one William M. Chapman. Count 41 charged interstate transportation of the cattle in violation of 18 U.S.C. § 2314. Counts 42 through 47 charged use of wire

communications (telephone) in interstate commerce in violation of 18 U.S.C. § 1343.

Judge Denney's extensive findings delineate the events relating to Counts 41 through 47. 407 F.Supp. at 1157–58. The court ruled that the evidence on Counts 41 and 42 was "equally balanced" and accordingly dismissed those counts. 407 F.Supp. at 1165. The court also held that:

> As to Count 47, [an interstate telephone conversation on January 8, 1975] the Court has carefully considered the principles enunciated in *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) and concludes that a judgment of acquittal is required as to this count. The telephone call charged in Count 47 occurred after the petition for bankruptcy was filed, and furthermore there is no evidence that Mr. Chapman's cattle were still at Fort Morgan when the call was made. It is, therefore, quite possible that the scheme to defraud Mr. Chapman was completed at the time of the call and that the call was not essential to the fruition of the scheme.

407 F.Supp. at 1165.

The court determined, however, that the interstate calls alleged in Counts 43, 44, 45 and 46 were essential steps in furtherance of the scheme to defraud, and accordingly found ABP guilty as charged "in Counts 43, 44 and 45." *Id.*[8]

 We disagree with the court's disposition of Counts 43 through 46 and reverse, with directions, as to those counts. We conclude that these counts, like Count 47, are controlled by *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). The scheme to defraud as charged in the

indictment reached fruition when ABP gained physical possession on January 6 of the Chapman cattle through fraudulent means. Therefore, the calls on which Counts 43 through 46 are based were not, in our considered view, made in furtherance of the scheme.[9]

## VII

In conclusion, we have carefully considered all issues raised in these appeals. The record attests to the meticulous efforts of the trial judge to afford all parties a full and fair opportunity to present their respective positions in what proved to be an extremely complicated case. The result reached by the trial judge with the one exception, demonstrates discerning judgment on his part in the disposition of the case.[10]

The judgment as to West is affirmed. The judgment of conviction on Counts 43, 44, 45 and 46 as to appellant ABP is reversed and remanded with directions to dismiss those counts. In all other respects the judgment as to ABP is affirmed. Costs shall be divided equally between the appellants.

---

8. Evidently the failure to include Count 46 in its finding of guilt was an oversight. The formal judgment of guilt does include Count 46 and it is so treated by ABP and the government in their briefs.

9. Since the district court dismissed Counts 41, 42 and 47, the net result of our decision is the dismissal of that part of the indictment alleging a scheme to defraud Chapman.

10. It is interesting to note that the attorney who did not represent West in the trial, but apparently was employed thereafter, made this observation in connection with the hearing on the motion for new trial:

> Judge, I have read the thing [record] and people in our office have read it, and I have never seen a better conducted trial. The lawyers were prepared and obviously you were prepared, and the only thing we disagree with was your verdict.