**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Charles T. PABIAN, Ralph W. Nichols,**
**and F. Lee Thorne,**
**Defendants-Appellees.**

No. 82–5676.

United States Court of Appeals,
Eleventh Circuit.

May 19, 1983.
Rehearings Denied June 27, 1983.

Frank W. Trapp, Sp. Asst. U.S. Atty., Jackson, Miss., for plaintiff-appellant.

Foley & Colton, P.A., Roger B. Colton, Douglas N. Duncan, West Palm Beach, Fla., for Thorne.

McGee, Jordan, Shuey, Koons & Schroeder, Stephen R. Koons, Lake Worth, Fla., for Nichols.

Before VANCE and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

VANCE, Circuit Judge:

The United States appeals the district court's final order granting the motions of

Ralph Nichols, F. Lee Thorne and Charles Pabian, defendants in this white collar criminal prosecution, to dismiss their indictment for conspiracy and mail fraud. The court dismissed the indictment based on a finding of prosecutorial abuse of the grand jury process. We reverse.

The Justice Department first presented this case to a federal grand jury impaneled in West Palm Beach, Florida, in November 1978. The government sought indictments against Thorne, Nichols and Pabian for violations of 18 U.S.C. § 371 (conspiracy), § 1341 (devising or intending to devise a scheme to defraud), and § 2 (aiding and abetting). The proposed indictments would have charged defendants with conspiracy to defraud the United States by obstructing the Department of Energy's administration of the Emergency Petroleum Allocation Act of 1973, mail fraud, and conspiracy to commit mail fraud. The first grand jury took testimony over a period of several months but in August 1979 voted not to return a "true bill."

During the pendency of the first grand jury proceeding, Richard Fishkin, one of the prosecutors in the case, appeared before a United States House of Representatives subcommittee holding hearings on white collar crime in the oil industry. Members of the subcommittee were critical of the Justice Department for lack of prosecutions in the industry.

In December 1979, on authorization of Deputy Assistant Attorney General John Keeney, who had appeared with Richard Fishkin at the House hearings, the case was presented to a second West Palm Beach grand jury. At the time of representment, the second grand jury had been only recently impaneled as an official body.

The second grand jury heard live testimony from fifteen witnesses, four of whom had not appeared before the first. Defendants Thorne and Pabian testified before the second grand jury. On January 29, 1980, the second grand jury returned an indictment. The indictment was identical with the proposed indictment which the first grand jury had failed to return.

The district court's order dismissing the indictment stated that a "combination of factors, none conclusive in and of itself," led the court to the finding that misconduct existed "of such a nature as to justify this extraordinary remedial action." Though the court did not specify with particularity the factors it found determinative, from our reading of the order we discern five. Four concerned the representment procedures the government used in this case: the government's motive in representment; its representment to a newly impaneled rather than an experienced grand jury; its alleged failure to adhere to its own resubmission guidelines; and its prosecutors' alleged refusal to allow defendant Nichols to testify before the second grand jury. The court also found that the prosecutor made prejudicial, nonverbal gestures during the grand jury testimony of Thorne and Pabian. Following a discussion of the applicable legal standard, we will consider each of these factors in turn.

In federal criminal prosecutions, the Constitution guarantees the right to an indictment by an unbiased grand jury. The fifth amendment's statement that no person shall be held to answer for a capital or otherwise infamous crime "unless on presentment or indictment of a Grand Jury" necessarily presupposes "an investigative body 'acting independently of either prosecuting attorney or judge.'" *United States v. Dionisio,* 410 U.S. 1, 16, 93 S.Ct. 764, 772, 35 L.Ed.2d 67 (1973) *quoting Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). The grand jury's historic role has been to serve as a "protective bulwark standing solidly between the ordinary citizen and the overzealous prosecutor." *Dionisio,* 410 U.S. at 17, 93 S.Ct. at 773. *See also Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962); *Ex parte Bain,* 121 U.S. 1, 11, 7 S.Ct. 781, 786, 30 L.Ed. 849 (1887). The reality that grand jury proceedings are "secret, *ex parte* and largely under the control of the federal prosecutor, magnifies this concern." *United States v. Serubo,* 604 F.2d 807, 816 (3d Cir.1979).

■■■ Federal courts possess the power and duty to dismiss federal indictments obtained in violation of the Constitution or laws of the United States. In addition, federal courts have a "supervisory power over the administration of justice to regulate the manner in which grand jury investigations are conducted." *Serubo,* 604 F.2d at 816. *See also United States v. Basurto,* 497 F.2d 781 (9th Cir.1974); *In re Grand Jury Proceedings,* 486 F.2d 85 (3d Cir.1973); *United States v. Estepa,* 471 F.2d 1132 (2d Cir.1972).

■■■ Although the federal judiciary exercises a supervisory role over federal grand juries, that role must be informed by a recognition that dismissal of an indictment for prosecutorial misconduct is an "extreme sanction which should be infrequently utilized." *United States v. Owen,* 580 F.2d 365, 367 (9th Cir.1978). Our function must also be defined in terms of the constitutional separation of powers between the judiciary and the executive, each branch vested with its own purposes and powers in relation to the grand jury. We agree with the ninth circuit's statement in *United States v. Chanen* that the "tradition and the dynamics of the constitutional scheme of separation of powers define a *limited* function for both court and prosecutor in their dealings with the grand jury." 549 F.2d 1306, 1312 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977) (emphasis in original). The *Chanen* court reasoned:

> In resolving disputes involving district court, prosecutor and/or grand jury, some appellate courts have attempted to pigeonhole the grand jury into one of the three branches of government created by the first three articles of the Constitution. For example, it has been said that the grand jury is essentially an agency of the court, and that it exercises its powers under the authority and supervision of the court. On the other hand, it has been asserted that grand juries are basically law enforcement agencies and are for all practical purposes an investigative and prosecutorial arm of the Executive branch of the government. To the extent

that these apparently conflicting statements reflect the view that the functions of the grand jury are intimately related to the functions of court and prosecutor, we have no disagreement with them. That view is irrefutable as a matter of fact. But under the constitutional scheme, the grand jury is not and should not be captive to any of the three branches. The grand jury is a preconstitutional institution, given constitutional stature by the Fifth Amendment but not relegated by the Constitution to a position within any of the three branches of the government.

*Id.* at 1312 (citations omitted).

■■■ The federal court and the federal prosecutor complement each other in their relationship to the federal grand jury. The prosecutor initiates the grand jury procedure, draws up the indictment, decides which witnesses to call and examines those witnesses who do appear. These functions are in essence "executive" and not subject to judicial review. *Id.* It is the court, however, which must compel recalcitrant witnesses to appear before the grand jury. *Id.* at 1313. And, because the court adjudicates the criminal case that results from the indictment, it is the court which, at least as a practical matter, has the power to dismiss an indictment for failure to charge all elements of the offense or for prosecutorial abuse of the grand jury process. These latter functions have prompted a number of circuits to hold that the federal judiciary exercises a supervisory power over the federal grand jury, a power which by definition is not coextensive with the court's power to correct grand jury abuses that violate the Constitution. While we recognize such a power,

> given the constitutionally-based independence of each of the three actors—court, prosecutor and grand jury—we believe a court may not exercise its "supervisory power" in a way which encroaches on the prerogatives of the other two unless there is a clear basis in fact and law for doing so. If the district courts were not required to meet such a standard,

their "supervisory power" could readily prove subversive of the doctrine of separation of powers.

*Id.* at 1313 (footnotes omitted). Applying these general principles to the present case, we believe that the district court's dismissal of the indictment was an abuse of discretion.

■ The district judge's order discussed five factors, the combination of which led him to dismiss the indictment. Four factors related to the represenment procedures followed by the government, and the fifth related to the prosecutor's conduct before the second grand jury itself. The first four factors must be viewed in the context of the government's virtually plenary power to represent and to control the grand jury's access to witnesses and information. The district court acknowledged that the government has the discretion to represent and that the fact that the first grand jury failed to indict was "not in and of itself legally significant." *United States v. West,* 549 F.2d 545, 554 (8th Cir.), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1601, 51 L.Ed.2d 806 (1977). *See also Ex parte United States,* 287 U.S. 241, 250–51, 53 S.Ct. 129, 131–32, 77 L.Ed. 283 (1932); *United States v. Thompson,* 251 U.S. 407, 413–15, 40 S.Ct. 289, 291–92, 64 L.Ed. 333 (1920); *United States v. Radetsky,* 535 F.2d 556, 565 (10th Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); *United States v. Gross,* 416 F.2d 1205, 1210 (8th Cir.), *cert. denied,* 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427 (1969). The decision to resubmit is a matter of prosecutorial discretion not generally subject to judicial scrutiny. *See United States v. Batchelder,* 442 U.S. 114, 124, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979); *Dresser Industries, Inc. v. United States,* 596 F.2d 1231, 1237 (5th Cir.1979), *cert. denied,* 444 U.S. 1044, 100 S.Ct. 731, 62 L.Ed.2d 730 (1980);[1] *Hardwick v. Doolittle,* 558 F.2d 292, 301 (5th Cir.1977), *cert. de-*

*nied,* 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978). Although this discretion only exists within constitutional constraints of equal protection, *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962), and cannot be exercised with actual or apparent vindictiveness, *Miracle v. Estelle,* 592 F.2d 1269, 1275 n. 11 (5th Cir. 1979); *Hardwick v. Doolittle,* 558 F.2d at 301, there is no indication that these defendants were selectively prosecuted on the basis of any illegitimate criteria.

■ The first specific aspect of represenment that appeared to disturb the district judge was a suggestion that represenment was motivated by the prosecutor's desire to soothe congressional criticism. The court made no finding that the represenment decision was politically motivated, however, and based on the record such a finding would have been clearly erroneous. The juxtaposition of the fact that the prosecutors testified before Congress with the fact that represenment subsequently occurred cannot support an inference of improper prosecutorial motive. The record reveals no evidence, direct or indirect, of prosecutorial bad faith.

■ The district court's second consideration was the represenment of the case to a novice grand jury after a veteran grand jury failed to indict:

This court cannot help but observe that in nearly 10 years it has seen no other instance of a no true bill or a failure to return a true bill by a grand jury. The court has also observed, and can take notice, that grand jurors return indictments unanimously at the beginning of their term but begin to cast dissenting votes in some types of cases towards the end of their term. The first veteran grand jury refused to return an indictment but a fresh grand jury returned this

1. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc) this circuit adopted as precedent all former fifth circuit cases submitted or decided prior to October 1, 1981. In *Stein v. Reynolds Sec., Inc.,* 667 F.2d 33, 34

(11th Cir.1982), the court held that Unit B panel or en banc court decisions of the former fifth circuit also are binding precedent in the eleventh circuit.

indictment a month after its empanelment.[2]

Once again, the court did not make an express finding of fact, nor would such a finding have been supported by the record. Although the court stated that it "took notice" that veteran grand juries are less captive to the prosecutor than are newly impaneled grand juries, it is unclear from the order whether the judge intended to take formal judicial notice of this fact. Such notice would have been improper in this case. Federal Rule of Evidence 201(b) requires that a judicially noticed fact be one "not subject to reasonable dispute" in that it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" or is generally known. The fact arguably noticed by the trial judge satisfies neither prong of the test. The transcript of the second grand jury proceeding suggests that the relative inexperience of a grand jury may in fact militate *against* its becoming a rubber stamp of the prosecutor: a new, fresh grand jury may be more likely to carefully consider all of the evidence and nuances in a complex case, more so than would a bored, experienced grand jury approaching the end of its term. Regardless of the age of the second grand jury in this case, the atmosphere of the proceeding was "not one of unfettered control by the prosecutor or a subjugated grand jury." *United States v. Narciso,* 446 F.Supp. 252, 296 (E.D. Mich.1977). On the contrary, the questions and directions of the grand jurors to the prosecutors, and the questions asked by the grand jurors of the witnesses, portray a grand jury actively participating in the proceeding.

The district judge's third factor was his conclusion that the Justice Department did not follow its own guidelines in representing this case. The United States Attorney's Manual § 9–11.220 suggests that representment not occur "in the absence of additional or newly discovered evidence or a clear circumstance of a miscarriage of justice." The district judge found that while "additional witnesses did appear before the second grand jury, there was no dramatic turn of events or newly discovered evidence; the legal theories under which the government proceeded were the same." In so finding, the district court in effect substituted its judgment for the discretion of the prosecutor. It is undisputed that additional witnesses did appear before the second grand jury. The records of the two proceedings clearly show that the second grand jury did not hear the identical evidence as had the first.

The fourth concern of the district court was that the prosecutor "in essence" denied defendant Nichols a chance to appear before the second grand jury by his "intransigence as to change of date, and his refusal to allow a deposition to be used." The judge made a finding of fact that the prosecutor "refus[ed] to accommodate" Nichols' request to appear and made a conclusion of law that such refusal was "part of the unfairness that permeated the representment proceedings." The court's finding is clearly erroneous as a matter of fact and clearly irrelevant as a matter of law.

A target of a grand jury investigation has no constitutional right to ap-

---

**2.** During the first pretrial conference on the case, the district judge observed:

I've been on the bench eight-and-a-half years and I have never seen a no true bill. I have only seen one case where there were as few as 14 Grand Jurors concurring in an Indictment. For years, I took my own Indictments which I enjoyed when I was the only Fed in Fort Lauderdale and a lot of times didn't have a Magistrate, and even after I got one I always preferred taking my own Indictments. So I had a chance for about five or six years to observe the phenomenon known [as] grand jury patterns and I did discern a

pattern of grand juries; that is, in their eighteen-month term, the first few months the Indictments are always unanimous, however many grand jurors are present. As they become more experienced in their job as grand jurors, you begin to get dissent and unanimity is not there. The majority vote is but the unanimous vote is not there. Occasionally, it will drop dramatically, and the lowest I have ever seen was fourteen grand jurors returning a true bill. I must say the case was so weak I threw it out at the close of the Government's case.

pear before that grand jury. *United States v. Leverage Funding Systems, Inc.,* 637 F.2d 645, 648 (9th Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981); *United States v. Gardner,* 516 F.2d 334, 339 (7th Cir.), *cert. denied,* 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89 (1975). A refusal to offer a putative defendant an opportunity to voluntarily testify might create the appearance of inequity and unfairness, however, and for this reason the United States Attorney's Manual encourages prosecutors to give such subjects a reasonable opportunity to appear. In the present case, the government's conduct was fair and in accordance with its own internal operating guidelines. The government made timely offers to Nichols for the purpose of affording him an opportunity to voluntarily testify before the grand jury. In a letter to the government, Nichols declined the government's invitation. His letter stated that he could not appear because of a "prior business commitment" and asked if it would be possible to reschedule his appearance or to answer by deposition any new questions not covered in his prior testimony. This letter cannot be construed as a demand or a request by Nichols that he be given an opportunity to appear. The implication of Nichols' letter is that he was interested in appearing only if there were to be new questions. We read Nichols' letter as a request *not* to appear. In any event, the attempts by the government to provide Nichols an opportunity to testify dispelled any possible appearance of inequity or unfairness in this case.

The district judge's final criticism of the representment focused on the prosecutor's conduct during the proceeding itself. Prior to entering its order dismissing the indictment, the district court held an evidentiary hearing. Four witnesses testified: Charles Pabian, F. Lee Thorne, Richard Fishkin and the court reporter who recorded the grand jury testimony. Pabian and Thorne testified that during their testimony prosecutor Fishkin made several gestures indicating either disbelief of or exasperation with their testimony. They also testified below that Fishkin paced back and forth within the grand jury room during their testimony. He would stop after accelerating his pace, put his hand to his head, and look at the ceiling, his facial expression and posture communicating incredulity.

Pabian testified that Fishkin's offensive gesturing occurred once during his testimony. Thorne testified that "two or three" gestures or demonstrations occurred during his appearance. Fishkin testified that while he might have moved his hand to his head, he never made any gesture for the purpose of influencing the grand jury. He stated, "I don't think I have ever slapped my forehead in response to an answer given by any witness in a grand jury or in trial."

The district court made a finding of fact that the prosecutor "made dramatic movements, gestures and facial expressions" during the testimony "in such a way as to show disbelief in the credibility of the witnesses." The judge further stated:

> The court held a hearing on this matter and credits the testimony of the defendants as to Mr. Fishkin's behavior. Mr. Fishkin denied that he ever "intentionally for the purposes of influencing the grand jury" made such gestures, but claimed no recollection as to whether he in fact did make facial expressions and gestures during the representment. The court finds no need to invade the grand jury process by personally interviewing grand jurors in this matter—after years of experience in judging credibility, the court finds that Mr. Fishkin did make prejudicial gestures and/or expressions even if unwittingly or unintentionally.

These three or four "unwitting" or "unintentional" gestures comprise all of the conduct that occurred before the grand jury that the district court found objectionable. No improper or harassing questions were asked, and appellees conceded that the prosecutor actually asking the questions treated them fairly. The conduct in this case does not approach the flagrant or abusive conduct that has led courts to exercise their supervisory power. *See, e.g., United States v. Cederquist,* 641 F.2d 1347, 1352–53 (9th

Cir.1981); *United States v. Stone,* 633 F.2d 1272, 1274 (9th Cir.1979); *United States v. Serubo,* 604 F.2d at 817–18. We hold that the few unwitting and inadvertent gestures by the prosecutor did not constitute misconduct and cannot support dismissal of this indictment.

Other aspects of the second grand jury proceeding reinforce our conclusion of its fairness. The second grand jury was told about the history and outcome of the earlier grand jury investigation. The grand jurors were instructed that they could call whatever witnesses they chose to hear. The prosecutors specifically requested the grand jury to review transcripts of persons the prosecutors were not planning to call as witnesses, to allow the grand jury to decide if it needed that testimony for any reason. The grand jury did in fact review those transcripts and requested and received additional testimony.

■ Because we reject the district court's finding that prosecutorial abuse of the grand jury process occurred, we need not reach the issue of whether a district court ever may, in exercise of its supervisory authority over the grand jury, dismiss an indictment absent a showing of prejudice to the defendant. At least one circuit, the third, holds that dismissal of an indictment in exercise of the supervisory power may be an appropriate remedy to correct flagrant prosecutorial misconduct despite the absence of prejudice to the defendant. *See Serubo,* 604 F.2d at 817. By contrast, in *United States v. McKenzie* a panel of the present fifth circuit recently held that "whether the court is acting under its supervisory authority or its duty to protect the constitutional rights of defendants, an indictment may be dismissed only where the defendant's case has been unfairly prejudiced." 678 F.2d 629, 631 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 450, 74 L.Ed.2d 604 (1982).[3] Regardless of the predicate of dismissal, at least in the present fifth circuit an indictment will be dismissed "only when prosecutorial misconduct amounts to overbearing the will of the

grand jury so that the indictment is, in effect, that of the prosecutor rather than the grand jury." *Id.* at 631. Although prejudice must be shown when dismissal is based on violations of the Constitution, *see, e.g., United States v. Merlino,* 595 F.2d 1016, 1018 (5th Cir.1979), *cert. denied,* 444 U.S. 1071, 100 S.Ct. 1014, 62 L.Ed.2d 752 (1980); *United States v. Cathey,* 591 F.2d 268, 273–74 (5th Cir.1979), no case binding on this court has yet resolved whether prejudice is required when dismissal is based on a district court's supervisory power. We save that issue for another day.

REVERSED.

---

**3.** This case is not precedent binding on this     court. *See* note 1, *supra.*